UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | : Docket #22-cr-618 |
| Plaintiff, | : |
| -against- | : |
| SURINDER CHEEMA, | : New York, New York<br>December 22, 2022 |
| Defendant. | |
| ---------------------------------: | |

PROCEEDINGS BEFORE
THE HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff: UNITED STATES ATTORNEY'S OFFICE
SOUTHERN DISTRICT OF NEW YORK
BY: THOMAS BURNETT, ESQ.
1 St. Andrew's Plaza
New York, New York 10007

For Defendant: KRAUT LAW GROUP
BY: MICHAEL KRAUT, ESQ.
6255 Sunset Boulevard, Suite 1520
Los Angeles, California 90028

Transcription Service: Marissa Mignano Transcription
Phone: (631) 813-9335
E-mail:marissamignano@gmail.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

INDEX

EXAMINATIONS

| Witness | Direct | Cross | Re-Direct | Re-Cross |
| --- | --- | --- | --- | --- |
| None | | | | |

EXHIBITS

| Exhibit Number | Description | ID | In | Voir Dire |
| --- | --- | --- | --- | --- |
| None | | | | |

THE DEPUTY CLERK: Good afternoon. This is the matter of U.S. versus Cheema; Case number 22-CR-618.

Starting with the government, please state your appearance for the record.

MR. BURNETT: Good afternoon, Your Honor. This is Tom Burnett for the government. I'm joined at counsel table by Special Agent Cunningham from the FBI.

MR. KRAUT: Good afternoon, Your Honor. Michael Kraut on behalf of Surinder Cheema, who I believe is in custody before you --

THE COURT: Yes.

MR. KRAUT: And I am remote.

THE COURT: Mr. Cheema, that's you sitting at the table there, right?

THE DEFENDANT: Yes.

THE COURT: Okay. So, your attorney normally would be present. He wasn't able to be here today. I would have been happy to put off the proceeding. He said that you did not want to do that, that you'd rather proceed today with him being remote. Is that correct? If it's not, we can put it off to another day.

THE DEFENDANT: Yes, Your Honor. That's

correct.

THE COURT: You want to go forward today?

THE DEFENDANT: Yes.

THE COURT: Okay. All right. May I have the time and day of arrest?

MR. BURNETT: Yes, Your Honor. Mr. Cheema was arrested on November 16th in the Central District of California at around 10:00 a.m. He was brought into this district last night, December 21st.

THE COURT: All right. I'm Judge Gorenstein. Let me begin by telling you you're not required to make any statements to the authorities. Anything you said to them could be used against you.

If you are not a U.S. citizen, you may request that a government attorney or a law enforcement official notify a consular officer from your country that you've been arrested. Even without a request, notification may be required by international agreement.

Do you wish to have the Consulate of Canada notified?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. So the government should make sure that occurs.

MR. BURNETT: Yes, Your Honor.

THE COURT: You have the right to be represented by an attorney. If you could not afford an attorney, you have the right to request that the Court appoint one for you.

I understand that Mr. Kraut, who's on the telephone, is retained. I have before me an indictment that contains the charges in this case.

Is it correct this has been referred for arraignment?

MR. BURNETT: That's correct.

THE COURT: The charge is that between February 2022 and November 2022 you conspired with others to distribute or possess with intent to distribute 5 kilograms or more of cocaine.

Counsel, have you seen this indictment?

MR. KRAUT: I have, Your Honor.

THE COURT: Have you reviewed it with your client?

MR. KRAUT: An associate at my firm did; yes, Your Honor.

THE COURT: Are you waiving the public reading?

MR. KRAUT: I am.

THE COURT: How does he wish to plead?

MR. KRAUT: He pleads not guilty, Your Honor.

THE COURT: All right. That's accepted.

I'll hear from the government next as to bail or detention.

MR. BURNETT: Yes, the government seeks detention on risk of flight, Your Honor.

THE COURT: All right. I'll hear from the government first, then we'll hear from Mr. Kraut.

MR. BURNETT: Yes, Your Honor. So this is a presumption case --

THE COURT: Just because Mr. Kraut's on the phone, maybe it's better if you sit so that the mic is closer.

MR. BURNETT: Of course.

MR. KRAUT: I'm actually able -- I'm able to hear, Your Honor. Thank you.

THE COURT: However you want to do it.

MR. BURNETT: So this is a presumption case because Mr. Cheema is charged with distributing (b)(1)(A) weight of cocaine. I know that the indictment just contains the charging language.

So to give a little background on what this case is about. So this case is about 400 kilograms of cocaine that were seized from a warehouse in

New Jersey between March 18th and 21st of 2022.

Basically, Mr. Cheema and a group of other people are part of a network of individuals who transport drugs around the United States, usually across the country from California to the East Coast. And then once those drugs are in the East Coast, they distribute them either around the East Coast or transport some of them up to Canada.

What would happen was that between March 18 and 21, over the course of three different shipments, the FBI agents who were working on the case observed trucks go to a warehouse in New Jersey.

Each time those trucks went to the warehouse in New Jersey, the trucks dropped off boxes. The agents had access to the warehouse. They seized the boxes that were dropped off by the trucks and found they contained cocaine in them. In total it was 400 kilograms of cocaine over the course of those four days.

After the agents seized the boxes, what they would do is they would refill the boxes with sham cocaine and put them in the warehouse. Then on March 21st, another truck came to the warehouse to pick up the boxes. So FBI agents observed a truck

arrive, they observed workers at the warehouse load on to that truck the sham cocaine boxes that the agents had placed there. And then they observed the truck drive away.

A little ways later, with the assistance of local law enforcement, officers pulled over that truck that had the sham cocaine in it and seized the sham drugs.

So the way that we know that Mr. Cheema and others were involved with coordinating these shipments of narcotics, is because at the same time as the FBI agents were supervising what was happening at the warehouse, they were also able to monitor in real time a series of Signal chats that Mr. Cheema and others were participating in.

So, Signal is an encrypted messaging application. And the people on these Signal chats each had a phone number associated with basically a screen name that they used on the chat. So Mr. Cheema used a screen name that was two money bags, basically two little pictures of money bags, and had a phone number associated with that screen name.

We know that Mr. Cheema used that screen name because Mr. Cheema has used that same phone

number on multiple occasions when he's traveled into the United States. He's given it to CBP as his phone number. We also know that it's his phone number because we obtained a search warrant for the iCloud account associated with the phone number, and it was filled with pictures of Mr. Cheema and Mr. Cheema's family.

So Mr. Cheema was participating in these chats. And what happened in the chats is that members of the conspiracy would talk with one another about coordinating when trucks were going to be arriving to drop off the drugs, where those drugs should be stored, and when the final truck was coming to pick up and take away those drugs.

Mr. Cheema, for instance, talked with members of the conspiracy about the way the drugs were packaged. And he also talked to members of the conspiracy about what he called "the count," which based on the context of the conversation, appeared to be the quantity of drugs that were arriving at any particular time.

In addition to those group chats, Mr. Cheema also had separate individual conversations with -- that were supervised by law enforcement. In one of them, he was telling someone

else in the conspiracy to basically move the drugs to a different location if that person felt like the drugs were in jeopardy.

And then, as I mentioned, this shipment of cocaine was eventually seized by law enforcement. And when members of the conspiracy, including Mr. Cheema, found out about that truck being pulled over, he asked other members of the conspiracy for police reports from that truck being pulled over. He had calls with members of the conspiracy and communications in which they recapped, trying to figure out what happened for the seizure. And also discussed a prior seizure that had happened a few months earlier in Kansas when a car in Kansas had been stopped that had 200 pounds of methamphetamine and cocaine in it.

So, long story short, our understanding here is that the text messages are very clear evidence that Mr. Cheema is a significant participant in a large scale cocaine trafficking operation. The value of the drugs that they're moving are exceptionally high. It's the kind of rule of thumb. It differs everywhere, but it's usually about $20,000 for the value of one kilo.

So moving 400,000 kilos -- sorry, 400 kilos

is a really considerable amount of money.

So the strength of the evidence here is powerful against Mr. Cheema, and he faces a long sentence in the United States if he's convicted of that crime, which certainly gives him a strong incentive to try and flee.

And that brings me to the other factors surrounding the risk of flight here, which I think are powerful. Mr. Cheema is a Canadian citizen with basically most of his ties to Canada.

According to the pretrial services report, his parents and brother reside in Canada. He didn't -- he's never moved to the United States. He came to the U.S. on a tourist visa in September 2022, so just a couple of months ago with his wife, who's also a Canadian citizen. So her ties are to Canada as well. He has no lawful ability to remain in the United States beyond March 2023.

So he has every incentive or a strong incentive to leave the country now and avoid prosecution rather than staying around to have this case play out. He also has financial ties to Canada.

According to the presentence report, he co-owns a business there, which is his primary

source of income. So that's just another reason why he has a very strong incentive to leave the United States.

I'd also note that there are a couple, sort of, concerning facts on the pretrial report that was prepared in the Central District of California. We just had a very brief chance to look at this, so we haven't reviewed it in depth. But, for instance, with respect to employment history, Mr. Cheema was reporting that he was the co-owner of an auto collision shop and has been working remotely, full-time.

By contrast, when his wife was interviewed, the wife was saying that -- she confirmed that he co-owned an auto collision shop and provided a different name for the business, and said he's been working on site. He also -- which raises some questions about where he's been.

He also seems to have under reported his travel. He mentioned traveling maybe three times to the United States. We have records showing that he's been in the United States, it looks like one, two, three, four -- at least six times just in 2022 alone. And including on one trip when he made a foot-crossing across the Mexican border back into

the United States from the Los Angeles area.

Again, we haven't run down all those angles yet, but I think in addition to the significant ties to Canada and really no ties to the United States, there's some candor concerns that the government has that -- with respect to Mr. Cheema's information he's provided in connection with reports about his ties to and travel to the United States.

THE COURT: Anything else?

MR. BURNETT: No, Your Honor.

THE COURT: All right. Mr. Kraut?

MR. KRAUT: Yes. I don't disagree with some of the issues that the government has raised. However, the larger scale conspiracy did not involve my client. My client only stepped into this in the last few months, and this is the only case or fact pattern that they should have my client involved in.

While the general conspiracy was involved with somebody out of Fresno, who was also one of the co-defendants, is the person who's been organizing this. And only -- my client only stepped into this in the last several months. In the last several months, he has come back from the Dominican Republic, stopped by the government, voluntarily co-operated with them, let them see his

phone. He knew what they were most likely looking at, and he didn't flee. He stayed in the United States or brought himself back in here. His intention is to reside in the United States, in the Central District of California, where his wife is currently there.

He is a -- the issue with the employment in Canada, it was a family auto repair collision shop, and he no longer is in good relationships with his brother, who is the primary owner. And so he was working remote. So, yes, he was part owner of this with his brother but he is now segued into a job in the solar industry. And one of the individuals who is looking to put his property up for bond is the other co-owner who lives in the Los Angeles area.

Your Honor, we have three individuals who are willing -- we provided that to Pretrial Services -- willing to put their homes up and they're all in the United States to ensure that my client appears. And also a significant amount of cash bonds and signature bond are also available. We sent that to pretrial services.

I don't believe my client is a flight risk. He's been trying to be in the United States. His family was actually brought into the United States

and is living in the United States. And if the government is aware while this is pending, even though his visitor status was going to be over in March, he's going to be allowed to remain during the pendency of this case. He is willing to give up any passport that the Court wishes. And if you wish, Your Honor, he also would be willing to be on a GPS monitor to ensure that he stays in the district that the Court were to order.

I don't believe he's a flight risk. I believe he's responsible. He knew that this was coming down and yet he stayed in the United States. And the place where they arrested him was actually a workplace of the solar industry job that he was working at.

THE COURT: Just so I can understand, Mr. Kraut, what is it -- at what date did he learn of this and why? Why did he learn of this investigation that causes you to say --

MR. KRAUT: I believe --

THE COURT: Hold on, let me finish. That causes you to say he remained?

MR. KRAUT: I'm sorry.

THE COURT: Go ahead.

MR. KRAUT: My understanding is in March or

April of 2022, he was coming in from the Dominican Republic with his wife, and the agent stopped him, asked him to go through his phone and he cooperated with them. His wife was obviously separated from him at that point. He knew what they were looking at. And so he was aware of that back in either March or April 2022 while he went back to Canada.

The government is correct. In September he asked for a visa to come into the United States to begin looking at and getting trained to see if he's going to be able to work. And he's seeking a work visa to be able to stay in the United States in the Southern District of California -- excuse me, the Central District of California.

THE COURT: Go ahead.

MR. BURNETT: A few points to respond, Your Honor. First, there's no indication at all from the government's evidence that he is a recent comer to the conspiracy.

As I mentioned, the charged conduct focused on the March 18 to 21 time period. And not only was he actively involved throughout the entire coordination period in terms of arranging packages to go to this warehouse, in a separate phone call or

Signal message afterwards, he also alluded to a prior seizure that had happened months earlier that involved 200 pounds of methamphetamine in Canada. So he was not even new to it by March. So that's the first point.

The second part on this border stop that Mr. Kraut referred to, it's just wrong to say that he had any idea about the investigation. What happened was, when he was entering the country, he was pulled aside for a further interview by CBP, at which point they asked to look at his cell phone. There was no mention made to him of there being an active criminal investigation or a drug investigation into him.

In fact, the whole point of when officers do that type of pull aside is they're trying to conceal the fact that there might be an investigation by making it look like a regular check, and that occasionally gets done at the borders. There's no evidence here that he knew he was under investigation for drug trafficking charges.

And finally, with respect to this part about his desire to stay in the United States, first, I'll begin by saying he can't lawfully work

in the United States. He's here on a tourist visa. So there's no job that he should be getting in the meantime or using the case as a way to kind of further his ties to the United States.

And secondly, it seems like he's moved here incredibly recently on a tourist application, and all of his serious family ties are to Canada, including his financial ties. In fact, it even sounds like, according to the Central District of California bail report, the location he's proposing to live going forward isn't even the same location that he's been living up until this point.

MR. KRAUT: May I comment, Your Honor?

THE COURT: Yes.

MR. KRAUT: All right.

While the government may believe that individuals who are asked to stop and look inside their phone don't believe that they are being suspected of looking at an investigation, that's not what happened in this instance.

My client clearly knew that people don't get stopped. He has never been stopped before since this began, prior to this event occurring. And then he was stopped in his home, was reviewed by agents, and separating him from his loved ones. And so it's

pretty obvious to him that this was a criminal investigation. And he didn't plead, we don't intend -- my client does not intend to seek the job as a way to stay in the United States.

He was in the process of being trained, without pay, to be able to be a part owner of the solar company that's in existence in the Los Angeles area. And he was going to be seeking a visa to be able to work in the United States. So he's not trying to bring ties in. He's already tied to it.

And as the government knows, at the time of the arrest, his full family, including parents, were here in the United States. And he wishes to remain here, and the Court wishes him to remain.

THE COURT: I'm sorry, you said his whole family, including parents, were in the United States? What did you say?

MR. KRAUT: I believe his parents were also here in the United States visiting at the time.

THE COURT: Oh, visiting. They don't reside here?

MR. KRAUT: They don't reside here, Your Honor. But you have a substantial amount of assets that people are willing to put up. Friends and family who know his character and know that he

will not skip out on this and --

THE COURT: Just -- I'm not sure where you're getting this from, but no one has -- other than a mention of Olek and $10,000, nothing in these reports talks about anyone putting up property. So I have no idea what you're talking about. Not that I'm necessarily letting him out anyway, but that seems to have been overlooked.

MR. KRAUT: I did submit yesterday. They asked for it at pretrial services, and I emailed that. If the Court would like, I can send that by email immediately.

THE COURT: No, I'm not sure -- it's not in the report so...

MR. KRAUT: They did ask you for it yesterday and I did provide it.

THE COURT: Okay, well, it hasn't been presented to me, so if you want to present it to me, I think you should do it orally.

MR. KRAUT: Okay. There is -- I'm not going to try and butcher their names, but the last name is Cheema. The date of birth of 3/20/1984 --

THE COURT: Hold on a second. You folks don't happen to have whatever this email is, do you? Is it sent to New York or to California, this email?

MR. KRAUT: New York. I just emailed it to your clerk, Your Honor, and he's welcome to share that with the government.

So there are three properties, one in Indiana, one in Florida, and one in --

THE COURT: Hold on. You emailed it to my chambers?

MR. KRAUT: To Marcos.

THE COURT: Did you send it to the entire group or just Marcos?

MR. KRAUT: I just hit his email. I'm trying to do that as you speak, but I don't have the entire group on a chat. Let me see if I can do that. If he's able to forward that on, I'd appreciate it. I apologize, your Honor. I am out of the country in an area which has spotty reception internet.

THE COURT: You didn't get an email that announced this arrest and so forth?

MR. KRAUT: My apologies. I didn't hear you, Your Honor.

MR. BURNETT: Michael, I think this would have been yesterday, the first email that Marcos sent around.

MR. KRAUT: And my client --

THE COURT: We just sent you an email and you can reply to it.

You sent it from chambers?

THE DEPUTY CLERK: No, I sent it from my personal.

MR. KRAUT: Thank you.

THE COURT: It's from someone named --

THE DEPUTY CLERK: Oh wait, I think Marcos just -- yeah, he sent it. I'll print it.

THE COURT: No, no, no you don't have to print it. Sorry. Hold on. We think he might have forwarded it.

THE DEPUTY CLERK: I'll send it to you directly, Judge. Did you get it?

THE COURT: Yes. Now we have to get it to the government, but we don't have -- you don't have --

MR. BURNETT: I don't have it, Your Honor.

MR. KRAUT: I sent it to Mr. Burnett. It's now been sent to Ms. Foley.

THE COURT: I mean, who are these people? How do they know him?

MR. KRAUT: They are friends and family, Your Honor, who reside in the United States.

THE COURT: All right. The first person I

assume is a family member because it's the same name. Second is the Olek person.

MR. KRAUT: The Olek gentleman is the individual who owns the -- it's the full owner of the solar equipment company in Southern California, but he owns property there, and they have property in Florida as well.

THE COURT: Okay. And the third person?

MR. KRAUT: The third person is a friend of the family that has a house in Illinois with a substantial amount of equity in that house.

I did ask them to all provide contact information for pretrial services, and all of that has been put onto the email.

THE COURT: I'm not concerned about contact information. I want to know who these people are.

MR. KRAUT: A friend of my client's.

THE COURT: The signature. Then there's another Cheema, presumably a relative. And then Cervantes, who is this?

MR. KRAUT: You know what, I think that my client can assist on that. I have no objection if he does.

THE COURT: Who is Renee Cervantes, sir?

THE DEFENDANT: He's a friend of mine.

THE COURT: Lives where?

THE DEFENDANT: I'm sorry?

THE COURT: Lives where?

THE DEFENDANT: In California.

THE COURT: And Marcus Estrada?

THE DEFENDANT: He's also a friend of mine in California.

THE COURT: Tejpatrap Bhullar?

THE DEFENDANT: Also a friend, Your Honor.

THE COURT: Living?

THE DEFENDANT: I'm sorry?

THE COURT: Living where?

THE DEFENDANT: I didn't get the name. Sorry, Your Honor.

THE COURT: Bhullar, B-H-U-L-L-A-R.

THE DEFENDANT: I believe in Indiana.

THE COURT: And last name, Dollywall, Gertcheron Dollywall?

THE DEFENDANT: He's also a family friend, Your Honor.

THE COURT: All right. We were hearing from Mr. Kraut about this, so I have to give the government a chance to respond.

MR. BURNETT: Yes, Your Honor. This is the first we're seeing these. I think even assuming

that there is, in fact, property to put up or people who are willing to sign a bond, we still don't think it's sufficient to keep Mr. Cheema here.

Mr. Cheema personally is not putting a whole lot of really anything meaningful on the line in this proposed package. These are all things that belong to, it sounds like, maybe one or two family members and otherwise friends, at least one of whom doesn't even know where he lives.

And then the other thing I'd like to put a point on that I alluded to earlier is the amount of money that was at stake in this cocaine trafficking operation is really significant. The 400 kilos at $20,000 a pop, we're talking millions and millions of dollars here. Which all goes to say that if Mr. Cheema is involved in what the government alleges he's involved in, he does have the type of access to unlawful funds that could allow him to reimburse people in the event that people lose property, which decreases the incentive for him to stay even further.

MR. KRAUT: May I comment to that, Your Honor?

THE COURT: Yes, go ahead.

MR. KRAUT: I don't believe the government

has any basis to be able to make a statement that he has access to large sums of money. In fact, their whole argument is he doesn't have anything and therefore he's a flight risk. And then to turn around and say, now he has access to pay people back, there's no evidence of that.

If they said that they found accounts with millions of dollars in it, I think that argument would hold water. But I don't believe that's relevant to the Court's decision at this point.

And the government did not address the issue of GPS or turning in the passports or being limited to where he can travel.

MR. BURNETT: I'm happy to address that briefly, if Your Honor thinks it's necessary.

So, with respect to GPS monitoring, as I'm sure the Court's well aware, GPS monitoring is traditionally a poor method of making sure someone stays in the United States because the reaction time between someone cutting the bracelet and then a pretrial actually finding them is too long before a person can actually escape the country.

Same with a passport. I think the issue here is that the primary place where Mr. Cheema would go to would be Canada, which has a massive and

porous land border with the United States.

MR. KRAUT: And a very good extradition treaty with the United States.

MR. BURNETT: In theory.

THE COURT: All right. It's a close case. If this person were a US citizen, it would be very easy. But the ties to a foreign country certainly make it much more difficult. On the other hand, it's a country we have good relations with for purposes of extradition.

MR. KRAUT: We also have an individual who has stayed within and lived up to the obligations of the visa he was here on. And he was abiding by the law and not accepting paid employment and just being trained while he was deciding how to get the visa to be able to work, if he was able to do that.

So he's been in full compliance with federal law up until this point.

THE COURT: Mr. Kraut, I actually wasn't inviting argument. I was giving my decision.

MR. KRAUT: Oh, I'm sorry.

THE COURT: That's all right.

I'm going to set some conditions. I don't know if he'll -- he's not going to be getting out today. I don't know if he'll meet them. But I'm

willing to accept that if there are the kinds of people we're talking about who are willing to put their entire financial futures on the line -- I'm not sure that the fact that you have a shipment worth a certain amount of money means that you have that in cash available somewhere. And I doubt these people would be counting on that. But I'll give you the conditions momentarily.

But my basis for doing it is, while this is a presumption case, I think the presumption has been overcome to the extent that the government has not shown by a preponderance of evidence that there's no possible condition or combinations of conditions that can ensure his return to court.

Again, I don't know if he'll make them, but I think they're the absolute minimum. To the extent he can't make them, then I'm finding that detention was required for any lesser -- that no lesser conditions would ensure his return to court. And, therefore, if he can't make them, detention is required. So just give me a moment.

Mr. Kraut?

MR. KRAUT: Yes.

THE COURT: The people you list as signature bond, you have sums of money next to them.

Does that represent cash they're willing to put up?

MR. KRAUT: I believe that's the amount that they are able to put up.

THE COURT: That they're willing to put up?

MR. KRAUT: I did not have time, Judge, I was out of the country, but I believe that that's the amount of a signature bond that each of them can do.

THE COURT: So they're putting up cash in the amounts next to their names, is that it?

MR. KRAUT: I can't answer that at this point, Your Honor. I asked them when I was leaving the country. And my understanding is they were doing it under signature bond. If you would like --

THE COURT: No, no. It's your understanding what? Finish the sentence.

MR. KRAUT: If you want to second call this for --

THE COURT: No. No. Why did you write down those numbers?

MR. KRAUT: I did not write the numbers down. I asked the family to get everybody together and to provide that, and I was leaving the country. So I asked --

THE COURT: What did you ask them to

provide?

MR. KRAUT: I asked them to provide assets that could be utilized. People talked about Canada and homes there, and I said, no, everything must be in the United States. And so everybody who used a home, it had to be in the United States and accessible to the government.

And then I asked for the bond amount that each person could be able to put up. And that's where they --

THE COURT: Okay. So that's what I just asked, if this is the amount they're willing to put up.

MR. KRAUT: Because I didn't confirm it with them, I can't certify that to the Court. I don't want to ever misrepresent anything to you. I'm trying to get the answer to that question right now, Your Honor.

Your Honor, I just got communication from the defendant's wife that they're willing to put up, and that is cash.

THE COURT: Got it.

MR. KRAUT: My apologies for not being prepared for that.

THE COURT: All right. Here's the

conditions: Defendant may be released on a $2 million personal recognizance bond to be co-signed by eight financially responsible people, secured by $500,000 in cash, and the three homes listed here belonging to Aman Pri Cheema in Indiana, Alexander Harit Suke in Florida, and the Hundals in Illinois.

Travel restricted to the Central District of California and the Southern and Eastern Districts of New York and points in between for trial. Surrender of any travel documents. No new applications. Drug testing and treatment as directed by pretrial services. Mental health evaluation and treatment as directed by pretrial services. Home detention with location monitoring.

Defendant to continue or seek employment if legal to do so. Defendant to maintain residence as approved by pretrial services. Defendant to be detained until all conditions are met.

Anything else from the government?

MR. BURNETT: Your Honor, I'm sorry, I missed the beginning. I heard $2 million personal recognizance bond with $500,000, is that $500,000 in cash for the people listed here?

Was there anything --

THE COURT: Hold on. Hold on. I said co-signed by eight financially responsible persons, secured by both cash and property. $500,000 in cash. I didn't identify who's putting it in.

MR. BURNETT: Okay.

THE COURT: And the three homes I mentioned.

MR. BURNETT: Okay. Got it. Thank you.

THE COURT: Anything else from the government?

MR. KRAUT: If I could, I'm getting clarification through the wife associated with a friend of his that the individuals want to put up a signature bond each of 100,000. They didn't have that cash.

Now, obviously, I apologize, but the personal homes are their homes that they're willing to give up if he were to leave.

THE COURT: I'll reduce it to $100,000 in cash.

MR. KRAUT: Thank you, Your Honor. And $2 million signature bond?

THE COURT: Correct. For everyone.

MR. KRAUT: And the three homes listed?

THE COURT: Correct.

Anything else from the government?

MR. BURNETT: No, thank you, Your Honor.

THE COURT: From defense counsel?

MR. KRAUT: Just once we are ready to -- do we do this with pretrial services once we're ready? How do we --

THE COURT: Yes, and the government, and the AUSA.

MR. KRAUT: Okay.

MR. BURNETT: Your Honor, I apologize --

THE COURT: Hold on. Hold on.

MR. BURNETT: I meant to move to exclude time until January 5th for the same reasons as the prior defendants.

THE COURT: If you want to make a record, make a record.

MR. BURNETT: Yes, Your Honor. So the parties can discuss discovery schedule and discuss a potential pretrial resolution to the case.

THE COURT: Mr. Kraut, do you wish to be heard on the application?

MR. KRAUT: I could not hear, Your Honor.

THE COURT: Why don't you do it again, Mr. Burnett.

MR. BURNETT: Yes, Your Honor. I move to

exclude time until the initial pretrial conference on January 5th, so the parties can discuss a discovery schedule and discuss a potential pretrial resolution to the case.

MR. KRAUT: No objection.

THE COURT: I grant the exclusion because I find that the ends of justice outweigh the best interests of the public and the defendant in a speedy trial based upon the need to discuss disposition and produce discovery.

All right. Thank you, everyone.

MR. BURNETT: Thank you.

MR. KRAUT: And, Your Honor, we are set for two o'clock on the 5th of January?

THE COURT: That's correct.

MR. KRAUT: Okay. Thank you, everybody.

0o0

C E R T I F I C A T E

I, Marissa Mignano, certify that the foregoing transcript of proceedings in the case of UNITED STATES OF AMERICA v. SURINDER CHEEMA, Docket #22-CR-618, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature ___Marissa Mignano______
Marissa Mignano

Date: February 16, 2023