

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 8, 2024

**BY ECF AND EMAIL**

The Honorable John P. Cronan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re: *United States v. Surinder Singh Cheema*, S1 22 Cr. 618 (JPC)

Dear Judge Cronan:

    The Government respectfully submits this letter in advance of the May 15, 2024 sentencing of the defendant Surinder Singh Cheema, on his conviction for conspiracy to distribute and possess with intent to distribute narcotics. For the reasons set forth below, the Government respectfully submits that a sentence within the range of 135 to 168 months' imprisonment calculated under the U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines") would be sufficient but not greater than necessary to achieve the purposes of sentencing.

**I. Offense Conduct**

    **A.  Narcotics Trafficking**

    The defendant is part of a drug trafficking organization that, from at least February 2022 through November 2022, conspired to ship large quantities of cocaine, methamphetamine, and other narcotics across the United States and Canada. (Presentence Investigation Report ("PSR") ¶ 11).

    In particular, between March 18 and 21, 2022, Cheema and certain co-conspirators, including co-defendants Christopher Burgos, Michael Gian William Habib, and Bhupinder Singh Virk, worked together to ship 400 kilograms of cocaine to a warehouse in New Jersey. (*Id.* ¶ 12). Through an encrypted messaging application, Signal, Cheema and his co-conspirators discussed the logistics of the cocaine shipments, including when the shipments would be arriving at the warehouse and how the cocaine would be packaged. (*Id.* ¶ 13).

    These messages show that Cheema actively coordinated the receipt of the cocaine. For instance, on March 18, 2022, Cheema asked his co-conspirator Bhupinder Singh Virk if "his people were close"—that is, whether Virk's associates had brought the cocaine near the warehouse. (*Id.* ¶ 15). Cheema and Virk also then discussed the delivery of approximately 168

kilograms of cocaine. (*Id.*). In another group chat, Cheema attempted to time the delivery of the cocaine to the warehouse to allow its transfer to another driver for eventual shipment to Canada. (*Id.*). In a third chat, with an individual who was, unbeknownst to Cheema, a confidential source (the "CS"), Cheema directed the CS to "make sure these books are safe" and to take them elsewhere if the CS felt something was amiss—in other words, to secure the cocaine shipments ("books") and move them out of the New Jersey warehouse if needed. (*Id.* ¶ 17).

Law enforcement officers seized a total of approximately 400 kilograms of cocaine shipped to the warehouse between March 18 and 21, 2022. (*Id.* ¶ 18). They then replaced the seized cocaine with "sham" drugs, so members of the conspiracy would not know the drugs had been taken. On March 21, 2022, law enforcement officers surveilled the warehouse as members of the conspiracy loaded cocaine onto a truck, and the truck departed the location. (*Id.* ¶ 19). Law enforcement officers stopped the truck soon after its departure and seized the "sham" drugs that had been loaded onboard. After Cheema lost contact with the truck, he instructed the CS to capture video of the truck. (*Id.* ¶ 20). And after he learned, through Signal group messages, that the truck had been stopped, Cheema and his co-conspirators expressed concern and discussed with the CS that some members wanted to take polygraph examinations to determine who had sold out the organization. (*Id.* ¶ 21).

On November 16, 2022, law enforcement officers arrested Cheema. (*Id.* ¶ 44). Pursuant to a search warrant, they also searched his electronic devices, in addition to devices seized from his co-conspirators. (*Id.*). The devices showed that, between February and November 2022, Cheema repeatedly discussed shipments of cocaine and methamphetamine with his co-conspirators, using "books" as a codeword for cocaine and "winz" or "wins" as a codeword for methamphetamine. (*Id.*). For example, in late February and March 2022, Cheema and his co-conspirators exchanged communications about 130 kilograms of methamphetamine that arrived at the Warehouse and was delivered without being seized by law enforcement. (*Id.* ¶ 25). And on March 1, 2022, Cheema discussed meeting Virk to receive "80 books," i.e., cocaine, a shipment which law enforcement seized near Kansas City, Kansas on March 2, 2022, and which contained approximately 96 kilograms of cocaine and 86 kilograms of methamphetamine. (*Id.*).

In total, in addition to the 400 kilograms of cocaine seized between March 18 and 21, 2022, Cheema was involved in coordinating the shipment of approximately 1,299 kilograms of methamphetamine and 364 kilograms of cocaine. (*Id.* ¶ 46).

### B.  The Wolfpack Alliance

Cheema and his co-conspirators engaged in the charged scheme as members or associates of the Wolfpack Alliance ("Wolfpack"), a Canadian drug trafficking organization notorious for large-scale narcotics trafficking and committing many murders in Canada and abroad in connection with its trafficking activities. (PSR ¶ 33).

Wolfpack is led by Rabih "Robby" Alkhalil, a convicted murderer and narcotics trafficker who is currently Canada's #2 most wanted criminal, having escaped from a Canadian prison in July 2022. (*Id.* ¶ 34). Alkhalil was tried in absentia and convicted of an additional first-degree murder in August 2022. (*Id.*).

That Cheema was a member of the organization is clear from the evidence. From prison, prior to his escape, Alkhalil used Signal to participate in coordinating the March 2022 cocaine shipments, communicating primarily with Habib, but also with Cheema. (*Id.* ¶ 35). After March 8, 2022, Habib also formally welcomed Cheema to Wolfpack through Signal and appeared to reference Alkhalil in his texts, stating: "Bros telling me he wants me to welcome you to the pack brother :wolf emoji: :wolf emoji: :wolf emoji:. . ." (*Id.* ¶ 36). And Cheema has a wolf tattoo on his chest, an apparent symbol of his loyalty to the Wolfpack Alliance. (*Id.*).

In addition, law enforcement recovered a photograph of the CS's wife from Cheema's phone. This was the same photograph that was used by Habib and another co-conspirator to threaten the CS regarding the narcotics lost due to the law enforcement seizure of the contents of the truck. (*Id.* ¶ 37).

## II. Cheema's Guilty Plea and Applicable Guidelines Range

In a one-count superseding indictment filed on November 16, 2022, S1 22 CR 218 (JPC), Cheema was charged with conspiring to distribute and possess with intent to distribute five kilograms and more of cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846. On December 19, 2023, pursuant to a plea agreement, Cheema pleaded guilty to Count One.

In the plea agreement, the parties stipulated to a base offense level of 38 under U.S.S.G. § 2D1.1(a)(5) and (c)(1), as the offense involved at least 1,299 kilograms of methamphetamine mixtures and 764 kilograms of cocaine, for a total converted drug weight of approximately 2,750,800 kilograms; a two-level deduction under U.S.S.G. § 3E1.1(a), because Cheema is a zero-point offender; and a three-level reduction under U.S.S.G. § 3E1.1(a) and (b), assuming Cheema clearly demonstrates acceptance of responsibility to the satisfaction of the Government and because he gave timely notice of his intention to enter a plea of guilty. (*Id.* ¶ 5(a)). Thus, the total offense level is 33. (*Id.*).

The defendant has zero criminal history points and is in Criminal History Category I. (*Id.* ¶ 5(b)).

At offense level 33 and criminal history category I, Cheema's Guidelines range is 135 to 168 months' imprisonment, with a mandatory minimum term of 60 months' imprisonment (the "Stipulated Guidelines Range"). (*Id.* ¶ 5(c)). As offense level 33, the fine range is $35,000 to $5,000,000. (*Id.*).

## III.   Probation's Recommendation

Probation's Guidelines calculation of the defendant's offense level, criminal history category, and Guidelines range matches those set forth in the plea agreement. (PSR 30). Probation recommends a downward variance to 120 months of imprisonment, followed by four years of supervised release. (*Id.*). Probation does not recommend a fine. (*Id.*).

**III. Discussion**

    **A. Applicable Law**

The Sentencing Guidelines provide strong guidance to sentencing courts after *United States v. Booker*, 543 U.S. 220 (2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. (PSR 49). The Guidelines are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).

Following the calculation of the applicable Guidelines range, the Court must consider the factors outlined in 18 U.S.C. § 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established [in the Guidelines];
(5) any pertinent policy statement [issued by the Sentencing Commission];
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita v. United States*, 551 U.S. 338, 348 (2007). To the extent a court imposes a sentence outside the range recommended by the Guidelines, that court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Cavera*, 550 F.3d at 189 (quoting *Gall*, 552 U.S. at 46).

**B. The Court Should Impose a Guidelines Sentence**

The Government respectfully submits that a sentence within the Stipulated Guidelines Range of 135 to 168 months' imprisonment would be sufficient, but not greater than necessary, to reflect the nature and seriousness of the offense; promote respect for the law; provide just punishment for the offense; and afford adequate deterrence to criminal conduct, as required by 18 U.S.C. § 3553(a).

**1. The Nature and Seriousness of the Offense**

The seriousness of the defendant's conduct supports a substantial term of imprisonment, well above the 60-month mandatory minimum sentence requested by the defense. Cheema helped coordinate a significant international drug trafficking operation. That operation involved repeatedly moving enormous quantities of dangerous drugs, both cocaine and methamphetamine, through the United States. (PSR ¶¶ 11-23). And crucially, Cheema's text messages show that he was far from a mere courier or bit player in the scheme: he played an active role in organizing the logistics of the narcotics shipments and conferred at length with his co-conspirators and the CS to secure the loads. (*Id.*).

The Government recognizes that, as a relatively new member of the Wolfpack Alliance, Cheema is less culpable than certain co-conspirators, such as his co-defendant Habib. But Cheema was nonetheless heavily involved in various aspects of the scheme and in the trafficking of hundreds of kilograms of narcotics over the course of many months. (*Id.* ¶ 38). While the defendant contended in his objections to the PSR that the additional narcotics shipments discussed in his Signal messages reflect drugs that were never actually purchased or transported (*id.* at 28), recovered text messages include, for example, photographs sent by the defendant depicting what appear to be opened kilograms of cocaine, as well as what appears to be crystal meth. The defendant also makes reference to the location of those narcotics, e.g., if anyone in Vancouver wants approximately 350 kilograms of winz (methamphetamine) that already landed, or crystal meth that the defendant has in "beach," which the Government understands to be slang for California.

The seriousness of the defendant's conduct is also compounded by the broader context in which he chose to sell these dangerous drugs: a narcotics crisis that continues to claim lives across the United States and in other countries, such as Canada.[1]

Methamphetamine is a particularly potent and dangerous drug. Its abuse leads to permanent brain and heart damage, damage to other vital organs, psychosis, hallucinations, violent behavior, and death.[2] The number of overdose deaths from psychostimulants (a category that

---

[1] Methamphetamine Use Is on the Rise, Worsening Canada's Already Complex Opioid Crisis, https://www.theglobeandmail.com/canada/article-methamphetamine-opioids-drug-crisis.

[2] U.S. Dep't of Health and Human Services, Learn About Methamphetamine (last updated Sept. 6, 2023), https://www.samhsa.gov/meth.

includes methamphetamines) has ballooned over the past decade, increasing on average about 30 percent each year, as shown by this figure below.[3]

Figure 4. Age-adjusted drug overdose death rates involving stimulants, by type of stimulant: United States, 1999–2018

Specifically, from 2011 through 2016, the age-adjusted rate of drug overdose deaths involving methamphetamine more than tripled, from 1,887 deaths in 2011 to 6,762 deaths in 2016,[4] and overdose deaths involving methamphetamine nearly tripled from 2015 to 2019 among people ages 18-64 in the United States.[5]

And, of course, as the same graph shows, cocaine has also led to increasing deaths, and is a highly addictive substance that destroys lives, destabilizes communities, and funds criminal organizations. Cocaine use leads to, among other things, paranoia, psychosis, stroke, seizures, respiratory failure, organ damage, and death.[6] Cocaine harms not just its users, but also their family and friends and the broader communities to which they belong. For this reason, major drug crimes are among "the most serious" offenses proscribed by federal law. *United States v. Dillard*,

---

[3] Hedegaard et al., CDC, Drug Overdose Deaths in the United States, 1999–2018, https://www.cdc.gov/nchs/data/databriefs/db356-h.pdf, at 4.

[4] Hedegaard et al., Drugs Most Frequently Involved in Drug Overdose Deaths: United States, 2011-2016. National Vital Statistics Reports: from the Centers for Disease Control and Prevention, National Center for Health Statistics, National Vital Statistics System. 2018;67(9):1–14, https://www.cdc.gov/nchs/data/nvsr/nvsr67/nvsr67_09-508.pdf.

[5] *See* Nat'l Institute on Drug Abuse, Methamphetamine-Involved Overdose Deaths Nearly Tripled Between 2015 to 2019, NIH Study Finds (Sept. 22, 2021), https://archives.nida.nih.gov/news-events/methamphetamine-involved-overdose-deaths-nearlytripled-between-2015-to-2019-nih-study-finds.

[6] *See* Nat'l Institute on Drug Abuse, What Are the Long-Term Effects of Cocaine Use? (May 2016), https://www.drugabuse.gov/publications/research-reports/cocaine/what-are-long-term-effects-cocaine-use.

214 F.3d 88, 101 (2d Cir. 2000); *see also United States v. Colon*, No. 10 Cr. 197 (CM), 2020 WL 4496761, at *2 (S.D.N.Y. Aug. 4, 2020) (describing cocaine as "a highly addictive drug that destroys lives, families, and communities"); *United States v. Qayyem*, No. 10 Cr. 19 (KMW), 2012 WL 92287, at *4 (S.D.N.Y. Jan. 11, 2012) (describing study in preeminent medical journal in which cocaine was found to have "second-highest mean harm score of all twenty drugs [under study], after heroin").

The harms posed by cocaine have only increased over time. Empirical data shows, for example, that overdose deaths involving cocaine have increased dramatically in the United States over the last two decades, as shown by the more granular graphical depiction below[7]:



Figure 21. Total Number of Deaths from Drug Poisoning Involving Cocaine in the United States and the District of Columbia, 2010 – 2018

Source: U.S. Customs and Border Protection⁹

And the crisis created by the availability of dangerous drugs is in no way confined to the United States. In British Columbia, for instance, the drug crisis was first declared a public health emergency in 2016, and last year the province saw a record of more than 2,500 overdose deaths.[8]

It is against this backdrop that Cheema worked with his co-conspirators to distribute hundreds of kilograms of dangerous methamphetamine and cocaine and sought to transfer these narcotics across national borders. Cheema's sentence should be commensurate with the scale of this scheme.

### 2. The Need to Promote Respect for the Law, Provide Just Punishment, and Afford Adequate Deterrence

---

[7] Drug Enforcement Admin., 2020 National Drug Threat Assessment (Mar. 2021), at 30, https://www.dea.gov/sites/default/files/2021-02/DIR-008-21%202020%20National%20Drug%20Threat%20Assessment_WEB.pdf.

[8] Success or Failure? Canada's Drug Decriminalisation Test Faces Scrutiny, https://www.theglobeandmail.com/opinion/editorials/article-how-bad-is-canadas-drug-overdose-epidemic-american-level-bad/,https://www.bbc.com/news/world-us-canada-68621012.

Without question, a significant sentence is needed here to promote respect for the law and provide just punishment. As courts in this District have recognized, the harm that is done by large-scale narcotics traffickers like Cheema and his co-conspirators is almost incalculable. "The lives affected, the families affected, the communities affected by drugs of that type and that volume is staggering." *United States v. Palagio Suarez*, No. 16 Cr. 453 (RJS) (Dkt. No. 160, Tr. 27). "[T]he drugs at issue here cripple individuals and destroy[] families and whole communities." *United States v. Santibanez*, No. 13 Cr. 912 (RJS), 2020 WL 3642166, at *3 (S.D.N.Y. July 6, 2020) (internal quotation marks omitted). When, as here, defendants fuel the narcotics trade and traffic substances as dangerous as cocaine and methamphetamine, they "participate[] in an important way in the distribution of a substance, which creates misery in the lives of the people who use it," and show they are "indifferent to the poison . . . being distributed and ruining people's lives." *United States v. Aguirre Cuero*, No. 15 Cr. 125 (PKC) (Dkt. No. 36, Tr. 22, 24).

A significant sentence is warranted here not only to adequately deter the defendant from engaging in such conduct in the future but also to send a message to other individuals who may be considering similar narcotics activities. Those who traffic these drugs and seek to profit from the ruination of others should know that they will face serious consequences.

### C. Conclusion

For the reasons set forth above, the Government submits that a Guidelines sentence is sufficient but not greater than necessary in this case.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:  /s/
Jane Y. Chong
Matthew R. Shahabian
Assistant United States Attorneys
212-637-2263/-1046