UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X

UNITED STATES OF AMERICA,

       v.                                            Case No. 22-CR-618 (JPC)

Surinder Cheema,

                                Defendant.
------------------------------------------------------------------- X

## SUPPLEMENTAL SENTENCING MEMORANDUM ON BEHALF OF SURINDER CHEEMA

                                                            Dawn M. Florio, Esq
                                                            DAWN M. FLORIO LAW FIRM
                                                            488 Madison Avenue, 20th Floor
                                                            NEW YORK, NY 10022
                                                             212.939.9539

                                                             Attorney for Surinder Cheema

Dated: October 7, 2024

To:     Honorable John P. Cronan
          AUSA Thomas Burnett
          AUSA Matthew Shahabian
          AUSA Jane Chong
          AUSA Amanda C. Weingarten
          US Probation Officer Jaleesa Harris

## **TABLE OF CONTENTS**

**I.**     **RELIEF SOUGHT**

**II.**    **INTRODUCTION AND SUMMARY OF CASE**

      **A. SUMMARY**

          **THE PLEA OF GUILTY**

**III.**   **ARGUMENT**

      **A. SENTENCING PURSUANT TO 18 U.S.C. § 3553(a)**

**IV.**    **HISTORY AND CHARACTER OF THE DEFENDANT**

**V.**     **SENTENCING REQUEST**

**VI.**    **ATTACHED CHARACTER LETTERS**

## I. RELIEF SOUGHT

Defendant Surinder Cheema, by and through his attorney of record Dawn M. Florio, Esq., pursuant to 18 U.S.C. § 3553(a) hereby respectfully submits this supplemental Memorandum requesting the Court sentence him to a non-guideline sentence of 60 months' imprisonment which is justified by the circumstances and factors to be considered, and is sufficient, but not greater, than necessary to comply with the purposes of sentencing.

## II. INTRODUCTION AND SUMMARY OF THE CASE

This supplemental Memorandum is respectfully submitted on behalf of my client, SURINDER CHEEMA, who is scheduled for sentencing at 10:00 AM on October 15, 2024. Provided herein is pertinent background and legal argument related to the issues raised in the Government's supplemental memorandum, and related to anticipated matters related to the Fatico hearing[1].

### A. SUMMARY

Surinder Cheema was arrested in the Central District of California on November 16, 2022 and ordered detained. On December 22, 2022, he appeared in the Southern District of New York and remined in custody. On November 16, 2022 Surinder Cheema was charged with others in a one count indictment. The indictment charged Mr. Cheema and others with participating in a conspiracy from February 2022 to November 2022 to distribute or possess with intent to distribute five kilograms or more of a substance containing a detectable amount of cocaine in violation of 21 U.S.C. § 841(b)(1)(A).

**The Plea of Guilty**

The Defendant appeared before the Honorable John P. Cronan, District Judge, and pled guilty to conspiracy to distribute or possess with intent to distribute 500 grams or more of a substance

---

[1] Counsel maintains all arguments made in the initial submission which, unless necessary, are not repeated here.

containing a detectable amount of cocaine in violation of 21 U.S.C. § 841(b)(1)(B) as a lesser included offense of Count One on December 19, 2023.

According to a written non-binding plea agreement the offense level is 33 and the criminal history category is I. The guideline range is 135 to 168 months' imprisonment with a mandatory minimum of 60 months' imprisonment. Probation recommended a non-guideline sentence of 120 months' imprisonment.

The Defense filed an initial sentencing memorandum requesting a sentence of 60 months' imprisonment. The Government filed an initial sentencing memorandum requesting a guideline sentence. On May 25, 2024 the Government filed a supplemental memorandum accusing Mr. Cheema of having been involved in criminal activity while incarcerated, including narcotics trafficking, threats, and orchestrating shootings. The sentencing was adjourned for a Fatico hearing and for the Government to provide discovery related to the matter.

### III.    ARGUMENT

#### A.    SENTENCING PURSUANT TO 18 U.S.C. § 3553(a):

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Perez, 397 F.3d 103 (2d Cir. 2005), the sentencing court must consider all of the factors identified in 18 U.S.C. § 3553(a), including the advisory Sentencing Guidelines (the "Guidelines") established by the United States Sentencing Commission. Those factors are, in relevant part:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentenced imposed:

    a. To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    b. To afford adequate deterrence to criminal conduct;

    c. To protect the public from further crimes by the defendant; and

   d. To provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) The kinds of sentences available;

(4) The kinds of sentences and the sentencing range established for the applicable category of defendant as set forth in the Guidelines

(5) Any pertinent policy statement issued by the Sentencing Commission;

(6) The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct

(7) The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

A sentencing court is permitted to find all the facts appropriate for determining a sentence, whether or not that sentence falls within the Guidelines. See Perez, 397 F.3d at 114-15.

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the mandatory Sentencing Guidelines system violated the Sixth Amendment. Pursuant to the Booker remedial opinion, and as further explained in subsequent Supreme Court cases, the sentencing court is to apply the factions as set forth in 18 U.S.C. § 3553(a). Section 3553(a), "as modified by Booker, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the traditional goals of sentencing." United States v. Kimbrough, 123 S.Ct. 558, 570 (2007) (citing sentencing goals set forth at 18 U.S.C. § 3553(a)(2)(A)-(D)).

The district court need not presume the Guidelines range is reasonable, and it must make an individualized evaluation of the facts and circumstances before it. In so doing, the sentencing court should consider the possibility that a Guidelines sentence is not just unnecessary to accomplish the goals set forth in § 3553(a), but that such a sentence would be "greater than necessary" – put differently, that a Guidelines sentence will actually thwart application of § 3553(a)'s command to impose the minimum sentence necessary to achieve the goals of sentencing. Rita v. United States,

5

127 S.Ct. 2456, 2465 (2007). The court is "free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." Kimbrough, 128 S.Ct. at 577 (Scalia, J., concurring).

In addition the heightened risk to inmates in federal correctional facilities during the height of the COVID-19 pandemic exposed serious problems within our prisons and jails which warrant consideration. In Davis v. Ayala, 135 S. Ct. 2187, 2209 (2015) Justice Kennedy, concurring, called for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant. See Id.. In United States v. Mateo, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) the Honorable Victor Marerro, a District Judge in the Southern District of New York, granted a downward departure where the defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case." Judge Marerro also stated that "potential conditions of confinement that a particular defendant is likely to encounter while in custody after sentencing" merit consideration, citing to Koon v. United States, 518 U.S. 81 (1996). See also United States v. Lara, 905 F.2d 599, 601 (2d Cir. 1990) (upholding a downward departure grounded on defendants potential for victimization in prison).

## B. FATICO

The Government has the burden of proving any of the facts proffered here, which would increase the guideline range, by a preponderance of the evidence. See United States v. Martinez, 2014 WL 7146846 (S.D.N.Y. 2014) at *10. The Government has alleged that this conduct should add three enhancements and remove two deductions. This is a two point enhancement for possession of a dangerous weapon in connection with a narcotics trafficking conspiracy under U.S.S.G. § 2B1.1(b)(1); a two point enhancement for directing the use of violence under U.S.S.G. § 2B1.1(b)(2); a two point enhancement for obstruction of justice under U.S.S.G. § 3C1.1; the removal of a two point deduction for certain zero point offenders under U.S.S.G. § 4C1.1; and the removal of the deduction for acceptance of responsibility under U.S.S.G. § 3E1.1..

6

This, as the Government stated in their supplemental submission, would take the Defendant from an Offense Level 33, and a guideline range of 135 to 168 months' imprisonment to an offense level of 43, with a guideline range of life in prison[2]. This is a staggering upward departure which is wholly unjustified by the facts which are actually provable, and even those baselessly alleged by the Government.

### C. THE ALLEGED CONDUCT IS NOT REVELANT CONDUCT

As discussed *infra* in Part III-D the Government has not proven any of this conduct. They have not even come close to the level of proof by a preponderance of the evidence. However it should also be noted that this conduct is not relevant conduct for the purposes of sentencing. In United States v. Montalvo, 467 F.Supp.3d 136 (W.D.N.Y. 2020) the Federal District Court for the Western District of New York (hereinafter "Western District" or "W.D.N.Y."), citing to United States v. Wernick, 691 F.3d 108, 115 (2d Cir. 2012), held that "[g]enerally, 'to qualify as 'relevant conduct' the conduct must occur in the course of commission of the offense of conviction.'" That is not the case here. The charged conspiracy ended, as per the plea agreement, in November of 2022. The conduct herein is alleged to have occurred starting in October of 2023. It should additionally be noted that there is no evidence provided by the Government, and it appears no allegation, that Mr. Cheema was involved with narcotics trafficking between his arrest in November of 2022 and this conduct in October 2023. The Government's own allegations would clearly see this to be a different course of conduct, not the conduct charged in the indictment.

In Wernick the Second Circuit discussed temporal overlap, but in a way that is relevant here, stating that:

> "[o]ne criminal act does not become 'relevant' to a second act under the Guidelines by the bare fact of a temporal overlap. If a bank robber assaults a guard in the course

---

[2] The Government calculated a revised offense level of 44, the maximum offense level is 43, therefore it would default to offense level 43.

7

of robbing a bank, the assaultive conduct occurs during the robbery and is 'relevant conduct' that may be used to enhance the seriousness of the offense for the purposes of the Sentencing Guidelines because it is part of the activity constituting the crime of conviction. But if a bank executive is engaged in embezzling money from her company from February to September, and she assaults a coworker at an office party in July, this does not become 'relevant' to raise the offense level of the embezzlement merely because it occurred 'during' the same period of time as the embezzlement. Without proof of a *connection* between the acts, the second event is literally a coincidence." (emphasis in original).

While that discusses temporal overlap, while this involves a *lack* of temporal overlap, the overall point remains that there must be some connection between the conduct alleged, and there is none here. The Court in Wernick states that "[t]his conclusion would hold even if the crimes were more similar. Suppose a bank robber spends months executing an elaborate scheme to rob Bank A, but opportunistically robs Bank B on a particular day during that period. Without more – for example, proof that robbing Bank B was done as practice ("in preparation for") for the robbery of Bank A – the crimes would be treated separately as unrelated acts." Wernick at 115, see also United States v. Ahders, 622 F.3d 115, 122 (2d. Cir. 2010). There is no connection between these allegations. The Government's supplemental filing alleges a second and distinct criminal conspiracy, not conduct that is relevant. Therefore the argument that the two level enhancement for possession of a firearm, two point enhancement for directing violence, and loss of the two point reduction for certain zero point offenders fail before the Government's evidence is even considered. *If* the Government had met their burden, which they most certainly have not (discussed *infra*), then these enhancements would not be proper.

8

## D. **THE GOVERNMENT HAS NOT MET THEIR BURDEN OF PROOF**

Under Fatico the Government has the burden of proof by a preponderance of the evidence. They have failed to meet this burden based upon the evidence presented thus far. They have made incredibly serious allegations, which the evidence has shown to be nothing more than speculation. In their May 25 filing the Government presents three main points as evidence attributing this conduct to Mr. Cheema: (1) the individual here used the nickname "Tana," a nickname that was used by Mr. Cheema in this case; (2) the individual here is familiar with an individual using the nickname King and another using the nickname Ghost, which are nicknames that two people involved in Mr. Cheema's case used; (3) the individual made a reference to being "in a cage." Since that filing five months have passed, during which we have received a number of discovery productions. At this time the Government appears to present three main points as evidence attributing this conduct to Mr. Cheema: (1) the individual here used the nickname "Tana," a nickname that was used by Mr. Cheema in this case; (2) the individual here is familiar with an individual using the nickname King and another using the nickname Ghost, which are nicknames that two people involved in Mr. Cheema's case used; (3) the individual made a reference to being "in a cage." After five months and as many discovery productions there is nothing else tying Surinder Cheema to this conduct but those three points, all of which are entirely speculative.

The use of the nickname "Tana" is not identifying. "Tana" is short for "Montana," a reference to the character Tony Montana from the movie *Scarface*. Tony Montana, as portrayed by Al Pacino, is one of the most iconic characters in cinema. The list of individuals and other works that make reference to Tony Montana is genuinely too long to include. The Scarface poster, showing a high contrast black and white image of the character with the title in bright red, is iconic as well. Mr. Cheema is not the only individual to use the nickname Tana or Montana. Additionally, according to Forebears.io, a website which tracks data related to forenames and surnames, there are more than 77,000 people worldwide with the first name "Tana," and more than 58,000 with the last name

9

"Tana."³ This does not even include individuals with a name which can be shortened to "Tana" such as "Tatiana," or those with the last name Montana or Montaña.

Nor is Surinder Cheema the only individual in his case to have used the nickname. USAO_000185 reflects that a "confidential human source" (CHS), believed to be CS-1, identified Photo #6 (USAO_000161) as Tana⁴. The individual depicted in USAO_000161 is not Surinder Cheema, it is Vickramjit Khela. When Mr. Cheema was arrested he was in a vehicle that was being driven by Vickramjit Khela, who also sent and received messages from the screenname "Tana." For a significant period of time, until September 2022, law enforcement reports reflected that authorities believed Tana to be Mr. Khela. It was Mr. Khela who sent these threatening messages, conducted these October 2023 narcotics transaction, and arranged this threatening conduct, as the affidavit attached to co-counsel's motion attests. Mr. Khela and his counsel were made available to the Government for an interview so they could confirm these facts. As of this time the Government has declined this invitation, which we believe would have disposed with the need for a Fatico hearing. Vickramjit Khela states clearly and unequivocally that Surinder Cheema had nothing to do with these actions, and had no knowledge of them at any time.

Regarding the fact that individuals with the nicknames King and Ghost are involved this is again speculative. There is not anything to indicate that these are the same individuals aside from the nicknames, neither of which are dispositive. Individuals have been using the nickname "King" and "Ghost" in many contexts for years⁵. Even if these individuals were the same Mr. Khela's affidavit makes clear that Mr. Cheema had nothing to do with these narcotics sales or this shooting.

---

³ https://forebears.io/forenames/tana; https://forebears.io/surnames/tana
⁴ This document, as well as the related USAO_000185 were filed as sealed exhibits to the Defense Motions filed on October 19, 2023 at Docket Entry 93
⁵ i.e. National Basketball Association (NBA) star LeBron James goes by "King James;" Elvis was "The King" or "The King of Rock n' Roll;" and at least two Major League Baseball (MLB) pitchers have used the nickname "King Felix." Ghost is also the name of a character from the popular television show *Power*, and is the titular character of *Power Book II: The Book of Ghost*.

10

Regarding the third point this is again pure speculation. The phrase "[a]nd I'm in a cage" could be interpreted as referring to someone being incarcerated, but that is far from the only interpretation. "I'm in a cage" could easily be read as referring to feeling trapped. Absent other supporting evidence this does not even begin to rise to the level of proof by a preponderance of the evidence. Additionally if Mr. Cheema was the one who sent these messages it is more logical that he would say he was in jail, as opposed to using coded language.

Most telling is that these arguments have not been further developed by concrete evidence in the five months since they were initially made. Throughout the numerous discovery productions given over to defense counsel by the government, including at least three phone extractions, the defense has not uncovered a single stitch of evidence showing that Surinder Cheema was the one who sent these messages. Not only has the Government failed to show by a preponderance of the evidence that Mr. Cheema sent these messages, the defense submits that they have provided *no* concrete evidence that Mr. Cheema sent these messages at all. Even in the absence of Mr. Khela's affidavit the Government has not come close to meeting their burden. However this is not merely a case where the Government is unable to meet their burden, it is a case where the defense has provided evidence which we submit conclusively disproves these allegations. Mr. Khela's affidavit makes clear that Surinder Cheema had nothing to do with this. He was not, and could not, have been responsible. The Government's contentions should be rejected, and Mr. Cheema sentenced to 60 months' incarceration.

Additionally it should be noted that throughout the length of this case there are no messages associated with Mr. Cheema that are threatening in nature. This stands in contrast to other members of the conspiracy, such as Mr. Virk. In Paragraph 20 of the Pre-Sentence Report there is a message where Mr. Virk states to the other members of the chat, including Surinder Cheema, "tell ur (sic) family to be safe." In context this is clearly a threat to the family of Mr. Cheema and others. In contrast, as in USAO_016519, a group chat allegedly involving CS-1, Habib, and Cheema, Mr.

11

Cheema is apologizing after becoming stressed about owing money to these dangerous individuals and expresses frustration, none of which amounts to any kind of threat. Additionally the consensual monitoring call between Mr. Cheema and CS-1 does not reflect any kind of threatening behavior. Throughout the conspiracy, even as Mr. Cheema's family was threatened and the owners of these drugs pressured the conspirators to pay them back for the seized drugs Mr. Cheema at no point resorts to threats or violence. It does not make sense then that he would resort to violence or threats while incarcerated in the MDC and awaiting sentencing.

Additionally the contraband phone recovered from Mr. Virk's cell contains messages where people state that the person using the phone should tell Sunny, Surinder Cheema, that they said hello. For example on Page 8459 of the extraction report an individual with a phone number ending in 1121 who identifies themselves as "WHOP" states, in relevant part "TELL SUNNY JOKER AND G I SAID WASSUP TOO[.]". The Government alleges that this phone belonged to Bhupinder Singh Virk, also known as Joker. If this phone belonged to Mr. Virk it is unlikely that someone would be asking Mr. Virk to tell himself that Whop said "wassup." The Government has alleged that Mr. Cheema and Mr. Habib had access to phones, if Mr. Cheema had access to a cell phone it seems much more likely that he would have used that phone directly to contact people, rather than having someone tell another person to say they said what's up. It appears that the cellphone was found in the cell, not directly in Mr. Virk's possession, and the ticket, USAO_030896-USAO_030899 attached as an exhibit, reflects the cell mate immediately admitting to the phone being his[6]. There is also a series of messages wherein the owner/primary possessor of the phone has an argument with a (presumably) female compatriot, around page 9422 about the fact that his cellmate was using the phone without the owner having let the woman know, as the female was sending messages, apparently of an intimate nature, which were intended solely for the owner of the phone and which

---

[6] The ticket reflects that it is re-written, and concludes that "it is not believable that inmate VIRK had no knowledge of inmate SMITH having a cellphone[,]" though Smith immediately admitted the cell phone was his. This is not indicative in any way that Mr. Virk possessed the phone, nor, more importantly, that Mr. Cheema had access to it. Moreover in 23 months at the MDC Mr. Cheema has not gotten a single ticket or violation.

she did not want the cellmate to see. For example on Page 9425 there is a message from 6/7/2024 where a phone number ending 9105 says, during this argument, "lucky I ain't send no p***y picks cause ya bunkie would've had a blast." The argument continues with the woman saying "[t]hats why you gotta tell me s**t like that" regarding the bunkie using the phone, as the owner, in sum and substance, assures this woman that there is no chance that his cellmate had seen or opened any of those messages.

The Government has stated to counsel that they believe that there is evidence that Surinder Cheema had access to this phone based upon two factors. The first is that there is evidence on the phone found in Mr. Virk's cell that someone searched for provisions regarding the treaty for prisoners with Canada. This contention presents a few problems.

The first is that it does not prove anything related to the Government's allegations. The fact that someone apparently used this contraband cellphone to search for things related to the treaty does not, in any way, prove that Mr. Cheema utilized a contraband cell phone. Mr. Cheema is not the only individual from Canada in that housing area, Mr. Habib is also Canadian, and upon information and belief at least one other individual on the housing area was Canadian. It is additionally just as likely that someone asked someone to look up those provisions, as that a Canadian person actually did so themselves.

The second, which is emblematic of the Government's approach to these allegations, is that they use this allegation to justify massive leaps in logic required to reach their preferred conclusion. The Government has not proven that Surinder Cheema utilized a contraband cellphone possessed by another person on his floor, they have merely indicated that it is *possible* that Mr. Cheema *could* have had access to a contraband cellphone because of its presence in the cell of his co-defendant who was on the same floor as him, which is entirely speculative[7]. However beyond that it is a truly

---

[7] It should be noted that co-defendants are frequently housed together, and the MDC is awash in contraband cell phones. It is not a stretch to say that they are present on essentially every floor of the facility.

13

gargantuan leap between "it is technically possible that Mr. Cheema had access to a contraband cell phone" and "Mr. Cheema sent these threats." It should be noted that Mr. Cheema's cell has been the subject of targeted cell searches on at least six occasions, none of which have recovered a cell phone. While the Government may argue that it is technically possible for an individual to have a cell phone within the MDC without it being detected it is again a massive leap from that argument to the conclusion that Surinder Cheema sent these messages.

The Government has also indicated they want to introduce a call where they allege Mr. Cheema used Mr. Virk's phone pin to make a phone call in violation of MDC procedure. Again this requires a truly massive leap. The idea that there is an indication that Mr. Cheema may have utilized the jail phones improperly has no logical relation to the conclusion that he therefore directed these attacks.

The Government also alleges that there is an account on the phone from Virk's cell which has the same profile picture as the Rocksteady (RK$3D¥) account, which was involved in the threatening conduct. This profile picture appears to be related to the Teenage Mutant Ninja Turtles franchise. The fact that a profile had a profile picture of an incredibly popular series of cartoons, animated and live action movies, and toys is hardly dispositive. It is another leap in logic made by the Government. However the presence of this profile picture seems to indicate that if anyone within the MDC sent these threats is was Mr. Virk: the one who threatened people in the charged conspiracy, and the one who had this phone in his cell.

The Government has entirely failed to meet their burden of proof, they have not even come close. They have presented bare speculation and nothing more. In fact when given the opportunity to speak with the actual perpetrator in this matter the Government declined to speak with him, and persisted in blaming this on Surinder Cheema despite the total lack of evidence. The facts presented are clear: Surinder Cheema had nothing to do with this, it was Vickramjit Khela.

### E. **THE GOVERNMENTS REQUESTED SENTENCE IS UNDULY HARSH**

Beyond the fact that the Government has failed to prove this conduct as required their requested sentence is incredibly harsh, almost uniquely so. According to the Sentencing Commission's Interactive Data Analyzer since 2015 there have been 46,400 people convicted of drug possession or trafficking charges, sentenced primarily under U.S.S.G. § 2D1.1, for cocaine and/or methamphetamine, in Criminal History Category I. Of those 46,600 individuals only 235 received a sentence of 25 years or above[8], that is just over one half of one percent. It should be noted that in addition to containing the drug weight table, which is the driving factor here, U.S.S.G. § 2D1.1 also contains the resulting in death enhancements, so there is a strong possibility that those individuals distributed narcotics which were proven to have killed someone. Nothing presented in the Government's memorandum indicates that Mr. Cheema is deserving of a sentence only given to one out of every 200 offenders, at least some of whom were responsible for someone's death.

When plea status is taken into account this becomes even more egregious. Two percent of these offenders were convicted at trial, as opposed to by plea. While the data analyzer does not provide a breakdown by plea status and sentence length the fact that sentences after trial are generally more harsh means that it is possible, if not likely, that there has not been a single similarly situated offender[9] anywhere in America sentenced this harshly since at least 2015. Nothing in the Government's memorandum shows that Surinder Cheema is deserving of such a uniquely harsh punishment, even if the allegations in the supplemental memorandum were proven.

---

[8] 111 received a sentence between 25 and 30 years, 97 received a sentence above 30 years but less than life, and 27 received a life sentence.
[9] That being an offender in Criminal History Category I who pled guilty to drug possession and/or trafficking charges, sentenced primarily under U.S.S.G. § 2D1.1, for cocaine and/or methamphetamine.

## IV. CONTINUED HARSH CONDITIONS

The harsh conditions of confinement which were highlighted in our initial memorandum have persisted. Mr. Cheema has been on lockdown for the majority of days since May, and it appears that at least two individuals have been killed within the MDC over the summer. Mr. Cheema has had his religious rights restricted, as he is unable to practice his religion within the MDC. Mr. Cheema is denied a prayer rug or religious texts, despite repeated requests, and his family and faith leaders have been unable to send even excerpts of religious texts to him. During the multiple cell searches BOP personnel have repeatedly removed religious implements such as a prayer rug, and not returned them to Mr. Cheema.

## IV. CONCLUSION

Given the Government's failure to meet the burden, as well as the complete lack of evidence of these incredibly serious accusations we ask that the Government's supplemental filing be stricken from the docket, and that the Court proceed to sentencing based upon the initial submissions, as if these specious allegations were never made. We also ask that the Court credit the Defendant for the additional six months he has spent at the MDC as the result of these delays, during which he has been on near constant lockdowns. The history and character of Surinder Cheema, along with the sentencing factors and the PSR, as well as the initial submission in this case, makes evident that a sentence of 60 months is fitting for the seriousness of the crime and is also consistent with 18 U.S.C. § 3553(a), which calls for a sentence sufficient, but not greater than necessary.

Respectfully yours,

Dawn M. Florio

Dawn M. Florio, Esq
DAWN M. FLORIO LAW FIRM
488 Madison Avenue, 20th Floor
New York, NY 10022
212.939.9539

Attorney for SURINDER CHEEMA