UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 22 CR 618 (JPC)

SURINDER SINGH CHEEMA,

Defendant. Hearing
------------------------------x

New York, N.Y.
November 19, 2024
10:10 a.m.

Before:

HON. JOHN P. CRONAN,

District Judge

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: MATTHEW SHAHABIAN
JANE CHONG
THOMAS BURNETT
Assistant United States Attorneys

DAWN M. FLORIO
DECLAN J. MURRAY
JEFFREY COHN
Attorneys for Defendant

Also Present:
Kelly Cunningham, FBI
Frank Mastroianni, Paralegal Specialist.
Manbir Sodhi (by Teams)

(Case called)

MR. SHAHABIAN: Good morning, your Honor, Matt Shahabian appearing for the government. With me at counsel table, starting to my right, is FBI Special Agent Kelly Cunningham, AUSA Jane Chong, Paralegal Specialist Frank Mastroianni, and AUSA Tom Burnett.

THE COURT: Good morning, Mr. Shahabian, Special Agent Cunningham, Ms. Chong, Mr. Mastroianni, and Mr. Burnett.

MS. FLORIO: Good morning, counsel. Good morning, your Honor, Dawn Florio of the Dawn Florio Law Firm. With me at counsel table is Declan Murray from the Dawn Florio Law Firm; of course, our client, Mr. Surinder Cheema; and Jeff Cohn.

THE COURT: Good morning, Ms. Florio, Mr. Murray, Mr. Cohn, and Mr. Cheema.

Let me first see if I can get a preview as to what to expect today at the hearing.

Mr. Shahabian, how many witnesses does the government anticipate calling?

MR. SHAHABIAN: The government anticipates calling one short witness, Lauren King, who is a forensic analyst with the U.S. Attorney's Office. Her direct will be maybe 20 minutes.

THE COURT: And then I saw the Power Point slides. Is the anticipation, based on that testimony, in closings you will be relying on those slides?

MR. SHAHABIAN: That is correct, your Honor.

THE COURT: Ms. Florio, are you in the position to say whether you anticipate calling any witnesses?

MS. FLORIO: Your Honor, we will not be calling any witnesses.

THE COURT: Mr. Khela is not going to be testifying today.

MR. COHN: If your Honor, may it please the Court, Judge, we do have Mr. Khela available by video if the Court would like to speak with him. He is not in the United States. That's an opportunity that we offer the Court, to hear Mr. Khela's testimony by video if the Court is inclined to use that process.

But before we get started with the taking of the evidence, may we be heard one more time about precluding the *Fatico* hearing based on a due-process argument?

THE COURT: Explain that one to me, Mr. Cohn.

MR. COHN: Judge, as of this morning --

THE COURT: Respectfully, try again.

MR. COHN: Respectfully.

THE COURT: We are doing a little bit better there, Mr. Cohn.

MR. COHN: Thank you.

We are getting continued evidence in the last 24 hours, and it highlights the fact that this is a new criminal

accusation, which is being made presumably to allow your Honor to evaluate it under the 3553(a) factors, right.

Because the government has said in their submissions that they are not seeking to break the plea agreement, and they are not seeking an upward departure from the guidelines. But they are seeking a sentence above the guidelines based on evidence that they are going to submit that they want your Honor to consider under 3553(a). All that evidence is of new criminal activity, which postdates the plea agreement, postdates every critical element of the criminal prosecution of Mr. Cheema except for the sentencing.

To use a hypothetical that I think illustrates in the starkest terms the due-process violation that this kind of argument would make -- and I am not going to mention the disingenuousness of saying, we are not trying to break the plea agreement, but we do want a higher sentence than that to which we have stipulated.

THE COURT: Explain to me then page 6 of your submission, where there is an argument about how the presentencing condition may be appropriate as a basis for a downward departure.

Aren't you breaking the plea agreement too?

MR. COHN: No, your Honor.

THE COURT: Really. You're not suggesting a downward departure with that language?

MR. COHN: I'm actually suggesting a nonguidelines sentence.

THE COURT: No. I know you're doing that. But you specifically, or maybe it was Ms. Florio, cite case law for a downward departure based on prison conditions; not a variance, a downward departure.

So I think you broke the plea agreement, but if you want to continue.

MR. COHN: I do.

Because the hypothetical, I think, illustrates that the severity of the due-process argument is that, your Honor, if they are able to persuade your Honor to use this evidence to raise Mr. Cheema's sentence, they can also indict him for it tomorrow, the same conduct, and that would not be covered by double jeopardy. That's not just going to pass constitutional muster.

What they are doing here is, they are trying to have a man sentenced for new criminal conduct without facing the burden of beyond a reasonable doubt.

So I think before we get to take any of the evidence, at a very minimum, I wanted to make a record of that condition, and obviously we will revisit it as it applies to the evidence that your Honor permits.

THE COURT: Understood.

After the hearing, I will ask for a briefing on that

issue, but I believe the argument is that is part of one drug conspiracy. Why is that argument wrong?

MR. COHN: Temporally they are years apart. They involve different players, although the allegation is some common players, and certainly not part of the same agreement, when you interpose a 22 or 20-month jail sentence for one of the defendants who has pleaded guilty, his time in jail. For a variety of factors, despite the fact that they are alleged to involve some of the same players, they are clearly two distinct conspiracies.

THE COURT: Mr. Shahabian, like I mentioned, I do think it makes sense to receive some briefing on a very short time frame after this hearing on that issue, but do you want to be heard at this point as to why conduct that occurred after the plea should be considered?

MR. SHAHABIAN: Yes, your Honor.

First, as the Court noted, this is relevant conduct for the offense conduct, which is a narcotics conspiracy.

As the government has explained in its supplemental sentencing submission, the evidence that the shootings were and threats were designed to collect on a drug debt, that is, narcotics went missing and the victims were told to pay up or return the narcotics, the defendant engaged in this conduct with Dupinderdeep Cheema, also known as King, who was one of the coconspirators in the charged conduct. That is, he

participated in the Signal chats to arrange for the shipments of cocaine and other narcotics, including the 400 kilos of cocaine seized from the New Jersey warehouse. So participating in continuing narcotics activity with coconspirators, even after arrest, constitutes relevant conduct that the Court should consider in determining the offense conduct.

But that's not the only basis for this conduct that is relevant for sentencing. Of course, under Section 3553(a), the Court has to consider the seriousness of the defendant's conduct, his personal characteristics, the need for specific deterrence, the need to protect the public from the defendant's crimes.

And someone who, after he was arrested and detained at the MDC, decided to arrange for shootings and attempted kidnappings while facing sentencing from this Court, I think, by its very nature, that speaks volumes to the appropriate sentence that the defendant should face, for specific deterrence, for the need to protect the public, and to hold the defendant accountable for his actions.

We didn't decide when these actions took place. The defendant decided to engage in this conduct after he pled guilty, pursuant to the plea agreement, and before sentencing. He now faces the consequences for those actions. It's perfectly appropriate for the Court to consider post plea conduct at sentencing, as courts regularly do when defendants

engage in obstruction, when they engage in misconduct at the prison. The fact that this is an extreme version of misconduct from the prison doesn't mean the Court shouldn't consider it.

THE COURT: Mr. Cohn, you must agree with that last point, though. It's very common to consider conduct while incarcerated at sentencing, even if it occurs after a plea.

MR. COHN: Yes. Such conduct, when it is not the basis of an additional criminal accusation, would be appropriate. But where, as here, it's plainly obvious that they are making a new criminal case in the context of that, I do think it encroaches on the defendant's due process rights. Otherwise, why do we have the proof beyond a reasonable doubt?

In connection with the government's disinclination to violate the plea agreement, I just note that your Honor, after the May 25 submission, issued an advisory on the docket that you were considering going upward from the guidelines. To my knowledge, that's not required in a 3553(a) analysis. It is required in a guidelines analysis. So the proof is in the pudding. I mean, the letter had its desired effect.

There are also salient facts that I think any one of which could have caused your Honor to say that evidence is not sufficient for me to consider, and the most glaring one is that 100 percent of the evidence that ties the violence in Canada to anybody at the MDC comes from this phone seized from another guy involved in the conspiracy, another guy who knew Mr. Khela,

and a guy who your Honor has already sentenced as a violent participant.

Right there, with nothing more, we are going to look at how the government has, in a very effective and, I would say, deceitful way tied use of unauthorized devices at the MDC to Cheema being connected to the violence. I can't deny. They have done an excellent job.

At the end of the day, I have confidence that your Honor will find it's not sufficient, even under the lower standard at a sentencing.

But I also think it will be perfectly appropriate for your Honor, under these circumstances, to find, based just on the fact that that phone was found in Virk's cell and the fact that this is allegations of a new crime, this is not permissible at a *Fatico* hearing.

THE COURT: Let me hear then from the government's witnesses. Like I said, I will consider those arguments after the hearing, but I do want to hear from the government's witness.

MR. COHN: One more thing before we open the evidence, your Honor.

Obviously, we have said this before, but now it's writ large, given the presence in the courtroom. If there is any way your Honor can impose sentence today, we advocate that that be the case.

THE COURT: I want to hear the evidence, but I think there will be additional arguments I am going to need from the parties. But if it is possible, I will try to do so.

MR. COHN: I know I had one more thing. One last thing.

The real thing is, just to make a record, we'd ask that the Court direct the government to respond to the question of how much of the evidence they provided in the last 24 hours is evidence to which we did not have access before.

THE COURT: Mr. Shahabian, how much evidence was provided in the last 24 hours?

MR. SHAHABIAN: I am not sure what evidence is being referred to. We marked new exhibits based on either discovery that had already been produced or publicly available evidence, like Google searches. I don't recall offhand when the last discovery production was, but we have met our discovery obligations. If the defense needs an adjournment to consider what we have produced, we are not going to oppose that.

THE COURT: Mr. Cohn or Ms. Florio, are you asking for an adjournment?

MR. COHN: No, we are not.

THE COURT: Let me first take the government's proof. We will see about whether or not there is a request to have Mr. Khela testified remotely.

Mr. Shahabian.

MR. SHAHABIAN: Yes, your Honor. Ms. Chong will be putting on the witness.

Before she calls the government's witness, the government offers all of the exhibits that we have marked on the index. That's 101 through 108; 200 through 220, and all subparts; 300 through 306-2; 400 through 408; 501 through 503-9; 601 through 605; 701 through 708; 801 through 812; 901 through 907-26; T-201-A; and T-501 and 502. The last two are English transcripts, so they are not being offered for their truth but as demonstrative aids.

THE COURT: Is there any objection from the defense to the admission of those exhibits?

MR. COHN: Yeah. We object based on largely the same representations I made before. We think that just the nature of the proceeding is violative of Mr. Cheema's due process rights, and these exhibits support that.

THE COURT: Any other objection, authenticity or other grounds?

MR. MURRAY: Your Honor, specifically with regards to the 900 series, what is called open-source evidence, the 907 series, a series of geolocation IP addresses which makes up the majority, actually, of the closing we received 38 minutes before the hearing was set to begin. Information we received was not in the November 13 exhibit production. It was in the November 18 exhibit production that was produced to us

yesterday around 3 p.m. or so.

We have had no time, given that fact, to verify certain authenticity, and we just want to note that for the record.

Again, we want to move forward again. We want to note this was given to us at the very last moment. Again, though it is a demonstrative, the closing slides were sent to us 38 minutes before the scheduled start of this hearing, a hearing which has been repeatedly adjourned since May, at the government's request.

THE COURT: In terms of the 900 series, do you wish to have additional time to examine these exhibits?

MR. MURRAY: Your Honor, we want to proceed today. If there is anything that becomes germane, we will address it in written submission.

MR. SHAHABIAN: If I can just briefly put on the record, your Honor, they have had the IP addresses that this is based on since the beginning -- not the discovery, but since we produced the Snapchat records some time ago. We have produced 3500 where we disclosed that a witness was going to be testifying about geolocation ability from IP addresses. They could put these into open-source searches just like we could.

THE COURT: I will receive in evidence these exhibits with the exception of being the last two, I believe, T501 and T502 which are not being offered into evidence.

Is that right, Mr. Shahabian?

MR. SHAHABIAN: That is correct, your Honor. They are English transcripts of recordings, so they are just being offered for demonstrative purposes.

THE COURT: What about T-201-A.

MR. SHAHABIAN: It's a mix of a Punjabi translation and some English. The Punjabi translations would be offered for their truth and the English as a demonstrative.

THE COURT: The defense has noted their objection to all of these exhibits on due-process grounds.

As to the last set of exhibits, the 900 set, the defense may file any subsequent objection to those exhibits after this hearing, after it has had a chance to take a closer look at them.

But I will receive in evidence Exhibits 101 through 108; 200 through 220, including any subparts; 301 to 306-2, including any subparts; 400 through 408; 501 through 503-9, including any subparts; 601 through 605; 701 through 708, including any subparts; 801 through 812; and 901 through 907-26, including any subparts, although I note that there is no 907-14.

As for T-201-A, that is received in evidence only with respect to the Punjabi translation. Any English transcript here is just a demonstrative.

(Government Exhibits 101 through 108; 200 through 220,

including any subparts; 301 to 306-2, including any subparts; 400 through 408; 501 through 503-9, including any subparts; 601 through 605; 701 through 708, including any subparts; 801 through 812; 901 through 907-26, including any subparts, but not 907-14; and T-201-A received in evidence)

THE COURT: I think I got everything.

Is that right, Mr. Shahabian?

MR. SHAHABIAN: That's correct, your Honor.

THE COURT: Ms. Chong, you may call the government's first witness.

MS. CHONG: The government calls Lauren King.

LAUREN KING,

called as a witness by the government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. CHONG:

Q. Good morning, Ms. King.

A. Good morning.

Q. Where do you work?

A. U.S. Attorney's Office at Southern District of New York.

Q. What position do you hold at the U.S. Attorney's Office?

A. I'm an investigative analyst.

Q. How long have you been an investigative analyst for the U.S. Attorney's Office?

A. Almost a year.

Q. And have you held any other positions at the U.S. Attorney's Office?
A. I have.
Q. What positions?
A. I was a digital-evidence technician.
Q. For how long were you a digital-evidence technician?
A. Thirteen months.
Q. What are your duties and responsibilities currently as an investigative analyst?
A. I support AUSAs and investigators throughout their cases.
Q. What kind of support do you provide?
A. I perform forensic examinations and review reports from those forensic examinations, among other investigative duties.
Q. And what kind of devices do you conduct these forensic examinations on?
A. Mobile devices, so cell phones.
Q. Ms. King, are you familiar with Cellebrite?
A. I am.
Q. What is Cellebrite?
A. Cellebrite is a suite of forensic tools that enables the extraction and review of data from digital devices.
Q. Are you familiar with Axiom Portable Case?
A. I am.
Q. What is Axiom Portable Case?
A. Axiom Portable Case enables the review of the data from

forensic extractions.
Q. Does either Cellebrite or Axiom Portable Case allow you to modify or delete select data from a phone?
A. No.
Q. In your role as an investigative analyst, do you regularly review data extraction reports generated through Cellebrite and Axiom Portable Case?
A. I do.
Q. Directing your attention to this case, what kind of data were you asked to review?
A. Reports for cell phones.
Q. And what kind of software was used to generate data for those phones?
A. Cellebrite and Axiom Portable Case.
Q. How many phones did you examine data for?
A. Two.
Q. Were you also asked to look at subpoena returns from certain third-party service providers?
A. Yes.
Q. Which providers?
A. Snapchat.
Q. I would like to look at data from each of the two phones that you just mentioned.
MS. CHONG: Mr. Mastroianni, can we pull up Government Exhibit 400.

Q. Ms. King, what is this document?
A. This is a preliminary device report, which is a summary of unique identifiers from the device.
Q. What is the make and model of this device, this phone?
A. This is an iPhone XR.
Q. How do you know that?
A. The detected phone model is listed here.
Q. I'd like to show you additional data from this phone.
MS. CHONG: Can we pull up Government Exhibit 401.
Q. What is this document?
A. This is a summary of user accounts from the device.
Q. And what does that mean?
A. The user of the device accessed or created these accounts on the device.
Q. Can you describe the first user account listed.
A. Yes. This is an iTunes Store account.
Q. What is the account user name?
A. Gottijatt@gmail.com.
Q. What is the creation date?
A. 2/23/2024.
Q. Is there also a creation time?
A. Yes. Just after 3 a.m. UTC.
MS. CHONG: Could we pull up side by side Government Exhibits 403 and 404.
Q. Ms. King, directing your attention to Government Exhibit

403 on the left side of the screen, what is this document?
A. This is a summary of web history from the device.
Q. And directing your attention to Government Exhibit 404 on the right, what is this document?
A. This is a summary of searched items from the device.
Q. What is the difference between web history and searched items?
A. Searched items were terms or phrases that were input into a search engine, whereas web history is any links that were browsed on the device, whether searched or not.
Q. So it's fair to say web history would reflect all the pages a user actually lands on?
A. That's correct.
Q. Directing your attention, again, to Government Exhibit 403 on the left, what does the column named title signify?
A. This is the page that the user was browsing.
Q. What does the column last visited signify?
A. This is the time of the last visit of the web page.
Q. What does the column deleted signify?
A. This is a yes-or-no value, depending on if this particular entry was deleted from the web history.
Q. Could you read out, just from this page, what terms appear in the user's web history.
A. Yes. Surinder Cheema, Toronto, Google search.
MS. CHONG: We can unhighlight.

A. Surinder Cheema, Google search. Surinder Cheema, Google search. Surinder Cheema, Google search.
Q. Can you explain the words Google search?
A. These phrases or terms were typed into Google search.
Q. Was the web history for these entries deleted?
A. Yes.
MS. CHONG: Can we turn to page 4 of Government Exhibit 403.
Q. Ms. King, could you read out the web history for the entries on this page.
We are going to go ahead and highlight the first three entries, and I'll have you read them.
A. The first entry is Japanese, Yakuza, Boss, New York, Google search. Second entry is Japanese Yakuza, Boss, Google search. The third entry is Japanese, Yakuza, Boss, Google search.
Q. We will leave it there.
MS. CHONG: Turning to Government Exhibit 404 on the right, the searched items document, could we highlight the top row.
Q. Ms. King, what does the column named value signify?
A. This is the term or phrase that was input into the search engine.
MS. CHONG: Can we unhighlight this top entry.
Can we highlight the first four entries.
Q. Ms. King, could you read out the items that were searched

on this page?
A. Yes. Rocksteady, Rocksteady, TMNT, Rocksteady, TMNT, scary drawing, Custom TMNT, Bebop, and Rocksteady.
MS. CHONG: Can we zoom in on the fifth and six entries on this page.
Q. Ms. King, could you read the searched items here.
A. Yes. Warpath, Marvel, Warpath.
MS. CHONG: Mr. Mastroianni, can we turn to page 2 of Government Exhibit 404. Can we highlight the first four entries on this page.
Q. Ms. King, could you please read the searched items entries on this page.
A. Yes. Warpath, GTA Security, Brampton, GTA Security Program, Lord of War.
MS. CHONG: We can unhighlight the screen.
Q. Ms. King, you just answered questions about a single phone extracted using Cellebrite, is that right?
A. Yes.
Q. Did you look at data from that same phone using any other software?
A. Yes. An Axiom Portable Case.
Q. Could you explain some reasons why an investigative analyst or any data examiner might examine data using both Cellebrite and Axiom Portable Case?
A. Yes. They might want to compare the results from the two

tools or validate one tool versus the other, depending on what updates are available in either tool at the time.

MS. CHONG: Mr. Mastroianni, can we pull up Government Exhibit 408-B.

Q. Ms. King, what is depicted on this page?

A. This is a summary of entries from the Apple Keychain.

Q. What would cause an entry to be saved in an Apple Keychain?

A. These are accessed or created in accounts and saved to their Apple Keychain.

Q. What application was accessed, according to the data on this page?

A. MySudo.

Q. What is MySudo?

A. MySudo is a third-party application that allows you to generate and use phone numbers.

Q. To be clear, would you be able to use that application to generate multiple numbers for the single phone?

A. Yes.

Q. When were the MySudo Keychain entries on this page generated?

A. 9/5/2023.

MS. CHONG: Would you pull up Government Exhibit 408-E.

Q. Ms. King, what is depicted on this page?

A. This is the metadata for a PDF document from the device.

Q. Were you able to view the corresponding PDF image?
A. Yes.
MS. CHONG: Can we pull up Government Exhibit 408-F. Can we zoom in on that first portion of the image.
Your Honor, can we have a moment to deal with the technical difficulty?
THE COURT: Sure.
Q. Ms. King, what is this document?
A. This appears to be a Google Image search result.
Q. Do you know anything about this particular image?
A. This is a Teenage Mutant Ninja Turtle character.
Q. Do you know anything about this image and the metadata associated with it?
A. Yes. This matches the metadata from the previous exhibit.
MS. CHONG: Can we scroll down to the bottom of this page slowly.
Q. You indicated this looks like search results?
A. Yes.
Q. Do you see the bottom where the image says related searches?
A. Yes.
Q. Could you read what's listed under related searches.
A. Rocksteady TMNT art, TMNT Bebop and Rocksteady art, bebop and Rocksteady 2012, bebop TMNT.
MS. CHONG: Could we pull up Government Exhibit 408-A.

Q. Ms. King, what is depicted on this page?
A. This is a summary of network usage for particular applications on the device.
Q. And from this particular page can you tell what application was used?
A. Yes. This is MySudo.
Q. Directing your attention to the column titled first used date/time, generally speaking, what does data in this column of the report tell you about the user's activity?
A. The user accessed this particular application using the network at this particular time.
Q. What day was MySudo accessed by the user, according to this page?
A. These entries are from 9/9/2023 and 9/5/2023.
Q. Ms. King, earlier you indicated you were asked to look at records from a third-party service provider, is that right?
A. Yes.
Q. Can you remind the Court which third-party service provider?
A. Snapchat.
MS. CHONG: Can we pull up Government Exhibit 810.
Q. Ms. King, what are we looking at?
A. This is a legal process return from Snapchat.
Q. Can you see the user name associated with this Snapchat account?

A. Sunny.cheema.

MS. CHONG: Can we expand columns B and C.

Q. Ms. King, what is the verified email associated with this account?

A. Surindercheema93@gmail.com.

MS. CHONG: Can we please pull up Government Exhibit 811. Could we expand columns, A, B, and C.

Q. Ms. King, what is this document?

A. This is a continuation from the legal process return.

Q. You're referring to Government Exhibit 810?

A. Yes.

Q. And how do you know it's a continuation of the same legal process?

A. The user ID matches.

Q. And you mean the user ID, you listed --

A. At the top, ending in C355.

Q. The long chain of numbers and letters ending with C355, is that right?

A. Yes.

MS. CHONG: Can we scroll down and highlight lines 846 through 850.

Q. Ms. King, can you explain what kind of data is reflected in these highlighted boxes.

A. These are IP addresses associated with activity on the account during a particular time.

Q. And what time is that?
A. These are all from September 5.
Q. September 5 --
A. 2023.
Q. What is an IP?
A. An IP is an Internet protocol, which is a unique identifier for a device connected to the Internet.
Q. As a general matter, can we discern any information from an IP?
A. Yes. It can be tied to an approximate physical location.
Q. For this case were you asked to look up these five IP addresses in an IP lookup database online?
A. Yes, I was.
MS. CHONG: Can we pull up Government Exhibit 907A.
Q. Ms. King, while we are waiting, you just indicated that you looked up the IP addresses you just saw on Government Exhibit 811?
A. Yes.
Q. Can you tell us anything about the IP addresses you looked up.
A. I am not sure I understand the question.
Q. I'll rephrase. Were you able to determine anything about the location of the user from those IP addresses?
A. Yes. For the particular IP lookup website that I use, they all came back to New York City.

MS. CHONG: Could you pull up Government Exhibit 907-A.

Q. Ms. King, do you recognize this page?

A. Yes.

Q. How do you recognize it?

A. This is from the IP lookup.

Q. This is from the IP lookup that you were asked to use, is that right?

A. Yes.

MS. CHONG: For the record, I referred to this as 907-A, but it is Exhibit 907-1.

THE COURT: Thank you.

Q. Ms. King, you said you looked at data extractions from two different phones, is that right?

A. Yes.

Q. So far you have answered questions about one phone, is that right?

A. Yes.

MS. CHONG: I'd like to move on to the second phone. Could we pull up Government Exhibit 200.

Q. Ms. King, what are we looking at?

A. This is an extraction report which has details about the extraction and details about the device.

Q. Did you review data from this device?

A. Yes.

Q. Based on this page, can you tell us the make and model of this phone?
A. Yes. This is an iPhone SC second generation.
MS. CHONG: Can we highlight the bottom half of the page.
Can we pull up Government Exhibit 214.
Q. Ms. King, what is this page?
A. This is a summary of device notifications.
Q. What are device notifications?
A. A device notification will alert the user that there is new activity in a particular app.
Q. What kind of device notifications appear on this page?
A. These are all Signal notifications.
Q. How do you know that?
MS. CHONG: Can we highlight the first entry.
Q. How do you know that these are Signal entries?
A. The service identifier.
Q. What is Signal?
A. Signal is a chat application.
Q. What is the difference between device notifications for Signal and actually viewing chats on Signal?
A. It won't have all of the content in the device notifications.
Q. Just a point of clarification, what won't have all the content?

A. The device notifications.

Q. What does appear in the device notifications as depicted on this page?

A. We can see the sender and the body.

Q. So we are reviewing at least some of the content from the chats, is that right?

A. Yes.

Q. Can you tell who sent the messages on this page?

A. Yes. These were sent from Ares, spelled with symbols, to hi.

MS. CHONG: Can we highlight the first two entries.

Q. You just indicated that the first message was sent by Ares, is that right?

A. Yes.

Q. Can you read the subject of the entry.

A. Subject: Ares, A-R-E dollar sign to hi.

MS. CHONG: Can we pull up Government Exhibit 215.

Q. Ms. King, what is on this page?

A. This is more device notifications.

Q. Can you tell what kind of application caused these notifications to be pushed to the device?

A. Yes. These are also from Signal.

Q. And who are these Signal messages from?

A. Rocksteady, R-K, dollar sign, 3-D, currency symbol.

MS. CHONG: Can we pull up Government Exhibit 216.

Q. Ms. King, what are we looking at here?
A. More device notifications.
Q. And who sent the device these particular chats, according to this page?
A. Warpath spelled with symbols, W, at sign, R-P, plus sign, H.
MS. CHONG: Can we bring up Government Exhibit 213.
Q. Ms. King, what is depicted on this page?
A. This is a list of contacts from the device.
Q. Can you read the contact names from top to bottom.
A. Yes. The first contact name is Ares, A-R-E, dollar sign. The second is Rocksteady in symbols: R-K, dollar sign, 3-D, currency symbol. The third is R-K, dollar sign, 3-D, currency symbol.
Q. What kind of information appears about these contacts on this page?
A. There are additional identifiers, such as phone number or previous user names.
Q. What is the profile name for the second entry?
A. The profile name is R-K, dollar sign, 3-D, currency symbol.
Q. What is listed as the old user name?
A. Ares, A-R-E, dollar sign.
MS. CHONG: Can we pull up Government Exhibit 217.
Q. Ms. King, what is this page?
A. This is a screenshot from the contact entry with details

about the contact profile.
Q. Did you view this page in Cellebrite?
A. Yes.
MS. CHONG: Can we pull up Government Exhibit 218.
Q. Ms. King, what is this page?
A. This is a continuation of the profile details for the particular contact entry.
Q. This particular page also has a photograph, is that right?
A. Yes.
Q. What is this photograph?
A. This appears to be the same photograph from the PDF in the Axiom Portable Case.
MS. CHONG: Alongside this document, Mr. Mastroianni, can we pull up Government Exhibit 408F.
Mr. Mastroianni, can we just pull up Government Exhibit 408-F.
Strike that.
Q. Ms. King, I am going to ask you to look at Government Exhibit 219.
Ms. King, what is this document?
A. This is a screenshot from the contact profile.
Q. Is there also a photograph on this page?
A. Yes.
Q. What application is the source of the profile on this page?
A. Signal.

MS. CHONG: Could we pull up side by side Government Exhibits 202 and 202-3.
Q. Directing your attention to Government Exhibit 202 on the left, Ms. King, what are we looking at here?
A. This is a chat conversation between two participants.
MS. CHONG: Can we zoom in on the first half, the top half of this document.
Q. Ms. King, what application was used to exchange these chats?
A. Signal.
MS. CHONG: Could we turn to page 7 of Government Exhibit 202. Can we zoom out.
Q. Ms. King, who sent the chats reflected on this page?
A. Mysterio.
MS. CHONG: Can we zoom in on the top message, please.
Q. Ms. King, could you describe the first text sent by Mysterio?
A. This is a screenshot of a profile.
Q. And were you able to view the screenshot, a larger version of that screenshot?
A. Yes.
MS. CHONG: Can we pull up Government Exhibit 202-3.
Q. Ms. King, what is Government Exhibit 202-3?
A. This is a blown-up version of the attachment that was sent.
MS. CHONG: Turning back to Government Exhibit 202,

could we highlight the second chat.

Q. Ms. King, could you read this chat.

A. Tana, new number.

Q. Ms. King, you just described a photo that was sent through Signal. What kinds of other media can be exchanged through Signal?

A. Videos, audio messages. The user can also make video calls or regular phone calls.

Q. Are you familiar with disappearing messages on Signal?

A. Yes.

Q. What are disappearing messages?

A. The user can set a time. After which it elapses, the message will disappear.

Q. Ms. King, at the start of your testimony you indicated that you looked at data from two phones. Were you asked to examine all the data from those two phones or just portions of the data?

A. Just portions of the data.

Q. Ms. King, were you involved in the investigation of this case?

A. No.

MS. CHONG: No further questions.

MR. COHN: Your Honor, would you permit me to do part of the cross and then my colleague, Mr. Murray, to do another part?

THE COURT: That's fine.

MR. COHN: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. COHN:

Q. Good morning, Ms. King, my name is Jeffrey Cohn. I'm one of the lawyers for Mr. Surinder Cheema.

A. Good morning.

Q. Now, you testified that you analyzed two phones for the government. Did you have possession of those two phones when you analyzed them?

A. No.

Q. Do you know where those phones came from?

A. No.

Q. You testified that there were some MySudo numbers created in 9/23 from one of the phones.

Do you remember that?

A. Yes. There were entries from MySudo for network usage.

Q. Do you know what numbers were created from MySudo numbers that were generated in 9/23?

A. I do not.

Q. Do you know what was on any of the MySudo numbers that were generated from that phone?

A. I don't.

Q. You testified that IP addresses can identify the location of a phone, is that correct?

A. Yes.
Q. Can IP numbers be changed on the phone to make it appear you're one place when you're actually somewhere else?
A. There are measures to disguise an IP address, yes.
Q. In your analysis did you do any analysis to figure out what the IP addresses that you provided the geolocating for were changed in any way?
A. I did not.
Q. Are there ways to figure that out?
A. I am not sure.
Q. If I told you that there are ways to figure that out, would you have any information to suggest that's not accurate?
MS. CHONG: Objection, your Honor. Confusing.
THE COURT: Overruled. You can answer.
A. Could you say that again.
Q. If I told you that there was a way demonstrably to prove whether an IP address was altered to make a phone look like it was in one place when it was really in another place, if I told you that, do you have any experience or evidence or knowledge to demonstrate that's not an accurate statement?
A. I would guess not.
Q. Now, in preparation for your testimony here, did you have meetings with the government personnel sitting to my right?
A. I did.
Q. And isn't it true that all of the data that was presented

for you to analyze was selected by the government?
A. That's true.
Q. And isn't it true that you have no idea whether, for example, their intention in presenting you that data was to demonstrate that Mr. Cheema was involved in something or not involved?
A. I wouldn't know the intentions.
Q. So, in other words, if the representatives at the government table had deliberately selected data to make it appear that one version of events was more likely to have happened than another, you would have no way of knowing that, right?
A. I suppose not.
Q. And, in general, in your experience analyzing electronic data, are you generally aware that electronic data can be manipulated to make that data indicate something which is either opposite or different than --
MR. COHN: Withdrawn, if your Honor please. That question went on way too long.
I have no further questions.
THE COURT: Mr. Murray.
MR. MURRAY: Thank you, your Honor.
Could we please display Government Exhibit 811. Could we expand A, B, and C to show the full IP address and the times.

CROSS-EXAMINATION

BY MR. MURRAY:

Q. Ms. King, you testified on direct examination that you did geolocation searches for at least some of the IP addresses in this document, correct?

A. Yes. I entered them into an IP lookup website.

Q. Do you recall which lookup website you used?

A. I don't recall the name.

Q. Is it possible it was whatismyipaddress.com?

A. I'm not sure.

MR. MURRAY: Now, can we go to line 846 of this document.

Q. Ms. King, you testified on direct examination that you looked up this IP address and that it was an IP address which came back to New York.

I would like to look two lines above that, lines 843 and 844. This indicates that this Snapchat account was logged into and then logged out of from that IP address on September 6, correct?

A. That appears to be so.

Q. Ms. King, did you do a geolocation search for IP address 99.235.42.39?

A. No.

Q. Would it shock you to know that comes back to Toronto?

A. I have no particular reaction.

Q. But, again, not New York, so you did not look into that one.

MR. MURRAY: Can we go to line -- one moment, your Honor.

Can we go to line 1922.

Q. Ms. King, in the government's exhibits in the 907 series you did do an IP address lookup for this number, correct?

A. No.

Q. There was no IP address lookup done for that number. It's not in the government's 907 series?

A. I don't believe so. I did 846 to 850 in this spreadsheet.

Q. Those are the only IP addresses that you looked up?

A. Yes.

Q. So any other IP addresses which were looked up and present in the government's 907 series was not done by you?

A. I don't believe so.

Q. Do you know who did it?

A. I wouldn't know.

Q. So you'd be unaware that that IP address comes back to Boston, Massachusetts?

A. I would be unaware.

MR. MURRAY: Could we go to line 1 of this document.

Q. Looking at line 11 of this document, you did not do an IP address lookup of the IP address 72.136.123.180, correct?

A. There maybe repeat IP addresses in here, but I do not

recall this one.
Q. You would not be aware that this IP address goes back to Greater Sudbury Ontario?
A. I would not know that.
Q. Do you have any way of personally verifying how accurate the location data of the website you used was?
A. No.
Q. To your knowledge, that is more general data?
A. I believe they provide a confidence interval of a kilometer range.
Q. One kilometer being approximately .68 miles in all directions?
A. A range of kilometers. It's not one kilometer. It could be 100, 200. They provide that.
Q. But, again, the confidence interval, it's within kilometers of the location.
A. For some particular websites, yes.
MR. MURRAY: One moment, your Honor.
Q. Ms. King, can you set up more than one Signal account from the same cell phone?
A. I'm not sure.
Q. Were you advised by the government that a man named Vickramjit Khela had access to Mr. Cheema's Snapchat account?
A. I was not advised of that.
MR. MURRAY: I have nothing further, your Honor.

THE COURT: Any redirect?

MS. CHONG: No redirect, your Honor.

THE COURT: You may step down. Thank you.

(Witness excused)

THE COURT: Does the government wish to call any further witnesses?

MS. CHONG: The government has no further witnesses, your Honor.

THE COURT: What about the defense? Does the defense wish to call any witnesses?

MR. COHN: Your Honor, may we have a brief recess before we answer that question?

THE COURT: You may. We will take about 10 minutes.

(Recess)

THE COURT: Did Mr. Cohn step away?

MR. MURRAY: Your Honor, I believe he is getting the link to the witness. If it's all right, I will just go grab him.

THE COURT: So I understand that there is a request for Mr. Vickramjit Khela to testify. There is a request for him to testify remotely, is that correct?

MR. COHN: Yes, your Honor, with the Court's permission.

THE COURT: Does the government have any objection to Mr. Khela testifying remotely?

MR. BURNETT: Your Honor, as we outlined in the letter that we submitted to the Court on October 11, we don't think allowing Mr. Khela to testify would be in the interests of justice in this case because he is not coming to the United States, where he would actually face the consequences for both the crimes he has admitted to in his affidavit and for the perjury that the government believes he has committed by claiming to be the one who used these three relevant Signal messages.

That said, we understand it's a *Fatico* hearing, and if the Court feels like it would be helpful to hear from Mr. Khela directly rather than just going with the affidavits, we are not going to stand strongly on that position.

THE COURT: Thank you.

As to the lack of a viable enforcement mechanism if the witness were to not testify truthfully, I think that will be appropriate grounds for cross-examination that I'll allow.

Courts, essentially in the trial context, evaluate a request for testimony remotely under the same standards as Rule 15, which deals with depositions. I think the Second Circuit dealt with that in *Gigante*.

There are essentially two main factors. One is whether the testimony is material to the case and the second is whether the witness is available to testify in person. It essentially goes to whether there are exceptional

circumstances. And proceeding in this manner would be in the interests of justice.

I think the standard probably is certainly relaxed in a *Fatico* hearing than it would be at trial. It certainly does seem to be, based on reviewing the affidavits, that the testimony would be material, as it will go to the core issue of whether the person speaking or identified in chats and messages as Tana or as Ares is the defendant in this courtroom or someone else. It seems like materiality is met.

In terms of unavailability, can you say something, Mr. Cohn, about why Mr. Khela cannot testify in person or is unable to testify in person?

MR. COHN: He does not want to subject himself to the United States justice, your Honor.

THE COURT: I take it there is no way to require his appearance from the defense perspective?

MR. COHN: I haven't thought about it, but I think there would be significant tension between the Fifth Amendment and any such direction.

I will, before his testimony, highlight for your Honor an issue that I think will run through maybe part of the argument, and that is whether *Brady v. Maryland* applies to this proceeding. You have heard some testimony, and I think you have seen some submissions, especially today, about the importance of Snapchat, for example, to show that the defendant

used a phone.

And in connection with that, I believe the testimony that we are about to elicit will show that, apart from everything else before your Honor, the witness told the government that he used Snapchat. We will make whatever consequential arguments based on that.

But also, in a more general sense, to the extent that there may have been issues regarding government disclosures, either to the Court or defense counsel, that either alighted or violated *Brady*, we would ask your Honor to consider those issues.

THE COURT: We will take that up as it comes up, but thank you for previewing it.

I will allow Mr. Khela to testify remotely. I believe we are trying to set up a Teams link for him.

I do just ask everyone to be as mindful of making sure that our reporter is able to take down everything with the audio that will be coming in, so I may stop folks occasionally if there seems to be an issue. Of course, our reporter, Mr. Greenblum, should feel free to chime in as well if there are any issues.

MR. COHN: While I am waiting for the Teams link for the Court to send, I advise the Court that Mr. Vick is in the office of his lawyer, as I understand it. I just wanted to let you know.

THE COURT: Thank you. Is that the individual whose letter you sent me?

MR. COHN: It is, your Honor.

THE COURT: Mr. Cohn, have you received the link yet?

MR. COHN: I have not.

By email, correct?

THE COURT: I believe so, yes.

MR. COHN: We have transmitted the Teams link to Mr. Sodhi.

THE COURT: Mr. Khela --

MR. COHN: For the record, that is not Mr. Khela. That is Mr. Sodhi.

MR. SODHI: Can you hear me?

THE COURT: This is Judge Cronan. We can hear you. Who is this?

MR. SODHI: Thank you. Your Honor, my name is Sodhi. It's spelled S-o-d-h-i. My first initial is M. I represent Mr. Khela. He is here with me. I was trying to organize the Teams link for him, sir.

MR. COHN: At the Court's convenience, I can call Mr. Sodhi and ask him what is taking so long.

THE COURT: I was just about to ask if he is there. Let me try that first.

Mr. Sodhi, are you able to hear us?

MR. SODHI: Yes, your Honor. I have Mr. Khela waiting

for the Court. I thought the Court was doing something. He is here.

THE COURT: I apologize. I thought you needed some time to talk to your client.

We will begin. I think I see Mr. Vickramjit Khela on the screen.

Is that you, Mr. Khela?

MR. KHELA: Yes.

THE COURT: Are you able to see the courtroom from where you are?

MR. KHELA: Yes, I can. But your voices, it's a little low. It's hard to hear.

THE COURT: We will try to speak up so you are able to hear better.

I'm Judge Cronan. I'm the judge in this case. I will ask the courtroom deputy to administer the oath.

Ms. Henrich.

VICKRAMJIT KHELA,

called as a witness by the Defendant,

having been duly sworn, testified as follows:

THE COURT: One of the attorneys will begin with direct examination.

Mr. Cohn, is that going to be you?

MR. COHN: It's going to be me. I am just wondering, looking at what I believe is Mr. Khela's view of the courtroom,

if there is a way to let the camera see the lecturn so he can see me.

THE COURT: Sure.

Let me also ask, maybe Mr. Murray, who is sitting next to Mr. Cheema, are you able to see the witness from where you're sitting?

MR. MURRAY: We are, your Honor.

THE COURT: Mr. Cheema, you can see the witness?

THE DEFENDANT: Yes, your Honor.

THE COURT: You may begin.

MR. COHN: Thank you.

DIRECT EXAMINATION

BY MR. COHN:

Q. Mr. Khela, have we spoken before?

A. No. I had spoke to you last night just because you wanted to let me know that I would be getting called possibly today, but that was about it.

Q. In that conversation, did you discuss any of your potential testimony today, the substance of your testimony?

A. No, I did not.

Q. What's your relationship with my client, Surinder Singh Cheema?

A. We have been friends since childhood. I consider him as an older brother to me.

Q. Do you love him?

A. Yes, of course I love him.
Q. Do anything for him?
A. I wouldn't say I would do anything for him.
Q. Would you lie here to the judge in order to help him?
A. No, I would not lie.
Q. Has Mr. Cheema or anyone on his behalf asked you to shape your testimony here today in any way?
A. No.
Q. Directing your attention to January of 2022 --
MR. COHN: Withdrawn, if your Honor please.
Q. Were you involved in Mr. Surinder Cheema's marijuana transportation business?
A. Yes.
Q. And as part of your involvement, did you use the name Tana or Little Tana?
A. Yes, I did.
Q. By the way, between you and Mr. Surinder Singh Cheema, who had the greater credibility in the drug business?
A. He did.
Q. Directing your attention to late 2021, early 2022, were you involved in setting up Mr. Surinder Cheema's solar panel business in California?
A. Yes.
Q. Did Mr. Surinder Singh Cheema --
MR. COHN: Withdrawn, if your Honor please.

Q. When Mr. Surinder Singh Cheema was arrested in November 2022, did you take over the running of that business?
A. Yes. I tried to, but after the arrest it just didn't end up working out. Ended up losing a bunch of money and came back home.
Q. Surinder Singh Cheema lost a bunch of money because you didn't run the business correctly. Is that what you're saying?
A. Yes.
Q. Were you also put in charge of paying a legal fee to a lawyer for Mr. Cheema after he was arrested in California?
If you could wait until the question is over. You are your overlapping. I don't know if it's electronics, but maybe pause a beat after I'm done with the question.
Now, did you in fact hire a lawyer to represent him?
A. I'm sorry. You're really cutting out a lot. Can you repeat your question.
Q. Sure. After Mr. Singh's arrest in November of 2022, did you hire a lawyer for him?
A. Yes.
Q. How much did you pay that lawyer?
A. I paid him around $200,000.
Q. Whose money was that?
A. It was Mr. Surinder Cheema's money.
Q. Did you have permission to do that from Mr. Surinder Singh Cheema?

A. No, I didn't. He didn't know that I paid him that much.

Q. What was his reaction when he found it?

A. He was not happy about it at all.

Q. How did he feel about you failing to sustain the solar panel business, as he expressed in conversation with you?

A. He was disappointed in me.

Q. Did there come a time when he stopped speaking to you?

A. We lost communication when I had to come back from California, which was around the ending of February of 2023.

Q. Did you feel bad about losing all that money for Mr. Cheema?

A. Of course I did.

Q. Did you try and pay him back?

A. Yes, I did.

Q. How did you decide to do that?

A. I got myself into transportation so I can make more money to help cover the loss, but he had no idea what I was doing.

Q. Did you pose as Tana during that time you were doing that?

A. Yes, I did.

Q. Did you find someone to hire you to transport drugs?

A. Yes, I did.

Q. Who was that person?

A. It was a customer -- it was an Asian customer in America, and he wanted me to transport drugs from America into Canada.

Q. To the best of your knowledge, did Mr. Surinder Cheema know

that person?

A. As far as I know, he does not know him.

Q. Before you made that agreement with this Asian gentleman, did you advise Mr. Surinder Cheema that you were going to do that?

A. No, I did not.

Q. And what happened --

MR. COHN: Withdrawn, if your Honor please.

Q. When did that relationship begin?

A. About five months ago.

Q. Five months ago from today?

A. From today I would say now it's been anywhere from six months, maybe a year.

Q. A year.

And do you remember when the first time this gentleman hired you to transport drugs was, approximately?

A. August of 2023.

Q. How did it go?

A. It was not good.

Q. What happened?

A. So I had lost a load because the transportation company that I had hired to help me bring --

THE COURT: Can you repeat that last statement.

Mr. Khela, can you repeat what you just said, your last treatment.

THE WITNESS: I said I lost the load using a transportation company named AMG.

THE COURT: Did you say AMG Global?

THE WITNESS: Yes, that is correct.

THE COURT: I wonder if the audio might be better if the witness is on mute and he is like speaking either on speaker or through a cell phone.

Do you think, Mr. Cohn, that's worth giving a try?

MR. COHN: You would like me to mute my mic?

THE COURT: I think probably the witness -- we are getting some background. I'm wondering if we mute -- if the witness goes on mute, but he calls into this line through a cell phone. You see what I mean?

MR. COHN: No. But I'm sure Mr. Khela will.

Q. Do you understand what the judge is asking? Instead of using whatever device you're using now, if you just call into the Teams ID using a cell phone.

MR. COHN: Is that what your Honor suggested?

THE COURT: Correct.

Mr. Sodhi, are you there?

MR. SODHI: Yes, your Honor.

THE COURT: What I'm wondering is, if we stay on video with Mr. Khela, have him on mute, but instead calls via cell phone or via a speaker phone and speaks to us that way, calls into the Teams dial-in. That may be a little bit better.

Sometimes it comes in a little clearer.

Do you understand what I'm suggesting?

MR. SODHI: Yes, I do, your Honor. I will try that just now.

THE COURT: Sure.

MR. SODHI: I think that makes it worse.

THE COURT: Mr. Sodhi, the other thing I'll ask, if you could turn off the audio on your computer so we don't get the audio coming from both the phone and your computer. Does that make sense, if you turn down the audio?

MR. COHN: Mute the computer. Mute the mic on the computer.

MR. SODHI: We did that. Is that better?

THE COURT: It seems a lot better.

MR. COHN: That's why he is the judge.

THE COURT: I think we can resume direct examination.

Mr. Cohn.

MR. COHN: Yes.

Q. When we left off with inferior audio I was asking you how the transaction with the Asian gentleman went, and I believe we got stuck on your answer.

A. So I had lost a load with the transportation company, AMG Global.

Q. When you say with the transportation company --

A. And the owner of that company. I'm sorry. I couldn't hear

you.

Q. I didn't realize you were not done with your answer, and I interrupted. Please continue.

A. Yes. So the transportation company was AMG Global, which is owned by Narinder Shokar, and I also worked with an associate of his who goes by Harjot Bains.

Q. And at the time these events happened, did you tell Mr. Surinder Cheema about them, or do you have any knowledge --

MR. COHN: Withdrawn, if your Honor please. I'll ask one question at a time.

Q. At the time these events happened, did you tell Mr. Cheema about them?

A. No.

Q. To the best of your knowledge, did he have any other way of knowing about what you just described?

A. No, he did not.

Q. And, by the way, were you in communication with a defendant known as Virk while that defendant was at the MDC?

A. Yes, I was.

Q. And did you help Mr. Virk set up an email account with the name Gottijat?

A. Yes, I did.

Q. And were you in contact with the defendant known as Michael Habib while he was at the MDC?

A. Yes. But I spoke with him very briefly.

Q. Did you put money in the commissary account for those two defendants?
A. Yes, I did.
Q. Did you have access to Mr. Surinder Cheema's Snapchat account?
A. Yes, I did.
Q. Prior to today, have you met with representatives of the prosecution of Mr. Surinder Cheema and spoken to them?
A. I'm sorry. Can you please repeat that.
Q. Sure. Before today, did you meet with the federal prosecutors prosecuting Mr. Cheema?
A. Yes. We had a meeting over Zoom, Teams meeting like this one.
Q. During that meeting, did you tell those prosecutors that you accessed Mr. Cheema's Snapchat account?
A. Yes, I did.
Q. And how were you employed, your last legal job?
A. Right now I'm unemployed.
Q. Were you ever employed at a cell phone store?
A. Yes, I was. I worked at a cell phone store for two to three years, for a long time.
Q. Do you consider yourself pretty knowledgeable about cell phones?
A. Oh, yes, very.
Q. You know how to change an IP address on a phone to make it

look like it's in a place that it's not?
A. Yes, I can.
Q. Going back to this drug transaction with this Asian gentleman, after the load was lost, can you tell us generally what happened next?
A. So the load was lost. It was around the end of October of last year. Narinder Shokar and Harjot Bains told me that the load had got busted at the border. And then basically what happened in that case is they are supposed to provide me some sort of paperwork which proves that in fact it was busted.
But I was getting threatened by the customer nonstop, and I kept asking Narinder, like what's going on, what's going on. And then he had -- after meeting him and Harjot countless times, he had finally provided me paperwork which I regularly sent to the customer, and right after they saw the paperwork, they said that this is fake.
Q. During this time --
MR. COHN: Withdrawn, if your Honor please.
Q. Did you communicate, either directly or indirectly, with Mr. Cheema about any of what you just discussed?
A. No, not at all.
Q. And how do you think he would have reacted if you told him what just happened?
A. He would have been very disappointed in me, very.
Q. Why?

A. Like very, very pissed off at me. Because he did not want me to get involved in any of this kind of stuff after his arrest. He wanted me to focus solely on solar and legitimate businesses.

Q. Did he tell you that?

A. Yes, he did, when I had met him before coming back home from the states.

Q. Now, returning to this failed drug transaction, can you describe for us the events that you have not yet described resulting in the arrest of a man named King?

A. Yes. So King is an associate and a friend of mine. I had reached out to him to help me out with the situation I had got myself into. So I was talking to King on the app Signal, and I was in Africa at the time, so I was -- at this point I was getting threatened so much that I was scared of my life and my family's life. So I had told him that I need to go after Shokar to -- I need to get the money back for the load to pay back the customer.

Q. Before you spoke to Mr. King, did you try using other contacts to get the money back?

A. I tried talking to Narinder Shokar and Harjot Bains myself, but they did not care at all. They told me: You're just a kid. We don't care. Screw off, basically.

Q. Did you establish group chats to discuss this situation?

A. Group chats. No. Maybe. Maybe one group chat.

Q. Now, when you say you contacted Mr. King, when you made the agreement with Mr. Shokar, was Mr. King aware of that at the time, or did he only come in later?
A. He came in later. He came in after the stuff that happened.
Q. And how many different aliases did you use yourself, if you can remember, when having various discussions about this transaction?
A. I used so, so many.
MR. COHN: May I have a moment, your Honor?
THE COURT: Yes.
MR. COHN: We have no further questions, your Honor.
Thank you, Mr. Khela.
THE WITNESS: No problem.
THE COURT: The next step, Mr. Khela, is that there may be cross-examination.
Mr. Burnett.
MR. BURNETT: Thank you, your Honor.
THE COURT: Give us one moment for the prosecutor to set up for cross-examination.
CROSS-EXAMINATION
BY MR. BURNETT:
Q. Hello, Mr. Khela. Are you able to hear me?
A. Yes, I can.
Q. My name is Tom Burnett. I'm one of the assistant U.S.

Attorneys.

We have not met before, correct?

A. No. You were not in the meeting with us. I think I spoke to Matthew.

Q. Right. You've spoken to some of my colleagues, correct?

A. Yes.

Q. Now, you're doing this testimony today from Ontario, Canada, is that correct?

A. Yes, that's correct.

Q. You live in Ontario with your parents, is it?

MR. COHN: Objection. Leading.

THE COURT: Overruled.

Q. You're not married, no kids, correct?

A. That is correct.

Q. And you decided not to travel to the United States for this hearing, correct?

A. Yes.

Q. You could have gotten on an airplane and come out here, right?

A. I didn't know that I was needed to do so.

Q. Would you have come out and do your testimony in person, if given the opportunity?

A. That is something I would have to speak to my lawyer about.

Q. You didn't speak with him about it beforehand?

A. No.

Q. Now, you're close with Mr. Cheema, correct?
A. That is correct.
Q. You're like a brother with him?
A. Yeah, you can say so.
Q. And you're close enough to him that you were willing to commit crimes to try to get money back for him, right?
A. Yes.
Q. So you had no problem committing a crime to help out someone like Mr. Cheema, who you were so close with, correct?
A. No, not exactly. I committed crimes because I needed money, and I also wanted to make back the money I had lost. I wasn't committing crimes for him. That's not right.
Q. It was to try to pay him back?
A. I did it willingly. Yes, I wanted to pay him back out of my like own will, but I also need to make money for myself. This wasn't solely the purpose of me having to pay him back.
Q. The last time that you were in the United States was when you were with Mr. Cheema, correct?
A. Yes. But I was still there when he was in jail as well.
Q. Got it. And this was a trip you took with him in 2022 that lasted until early 2023. Is that about right?
A. Yes.
Q. And you said in your affidavit that the purpose of that trip was to help set up a solar panel business, right?
A. That is correct.

Q. Now, you previously had an interview with my colleagues that we talked about briefly earlier, right?
A. Yes.
Q. And during that interview you refused to answer questions about whether that trip to California in 2022 was also for the purpose of setting up drug transactions, didn't you?
A. Yes, I did.
Q. Was it for the purpose of setting up drug transactions as well as the solar panel business?
A. I was there for solar panel business.
Q. Were you also involved in setting up drug deals while you were there?
A. No.
Q. But Mr. Cheema was the person you were traveling with, right?
A. Yeah, that's correct.
Q. And by November of 2022, on that same trip, he ends up arrested for coordinating a drug transaction across the country, right?
A. Yes, in November.
Q. So your testimony is you were on this trip with him for the full year of 2022 but were not involved in his drug transaction that he was ultimately arrested for?
A. Yes. Sometimes he would do stuff without telling me.
Q. Now, you met Mr. Virk on that trip, correct?

A. That is correct.
Q. But you didn't really talk with him or develop a relationship, is that right?
A. Not much, you could say.
Q. And you didn't talk to Mr. Virk after he got to the MDC, right?
A. I did sometimes.
Q. So you testified earlier today that in fact you set up an Apple account for Mr. Virk, is that right?
A. That is correct.
Q. But when you spoke to my colleagues, you told them that you had not communicated with Mr. Virk while he was at MDC, didn't you?
A. Yes, I did. And, honestly, I didn't know what to say at that moment just because I was under the impression that we would be talking about my affidavit and what was in my affidavit. I didn't want to get anybody in any more trouble than they are already in.
Q. So when you didn't have a chance to prepare, what you told my colleagues was that you had not talked to Mr. Virk while he was at MDC, correct?
MR. COHN: Objection. That mischaracterizes the testimony.
THE COURT: Why don't you rephrase, Mr. Burnett.
MR. BURNETT: I'll just move on.

Q. You stopped communicating with Mr. Cheema shortly after you left the United States in early 2023, is that right?
A. Yeah.
Q. And, specifically, I think you said you have not talked or communicated with him since about February of 2023, is that right?
A. That is correct.
Q. And you claim in your affidavits that after Mr. Cheema's arrest, you started using the Tana nickname for some of your drug dealing, right?
A. That is also correct.
Q. You used that nickname because Mr. Cheema was basically a bigger-deal drug dealer than you, correct?
A. Yes.
Q. Now, you knew that Mr. Cheema was a bigger deal in the drug-dealing world because you had been involved in dealing drugs with him even before his arrest, correct?
A. And I also used the name Tana because I always went by Little Tana.
Q. But you wrote in your affidavit that even Cheema didn't know you used the name Tana for drug-dealing purposes, correct?
A. That is correct. He did not know I was using the name Tana when he was in jail.
Q. Now, you knew what types of people to go to for drug dealing purposes after Mr. Cheema's arrest, right?

A. I'm sorry. Can you please say that one more time.
Q. Sure. So by 2023, you have arranged a cocaine shipment from the United States. That's what you testified about on direct examination, correct?
A. Yeah.
Q. And you were able to set that up because you were already in that network for drug trafficking, correct?
A. Yes.
Q. Now, you mentioned there was a customer in the United States who you were working for in August 2023, is that right?
A. That is correct.
Q. What was that person's name?
A. I don't want to say any names. I'm sorry.
Q. You're under oath. What's his name?
A. He went by the name Smooth.
Q. Do you have his real name?
A. No, I don't.
Q. Now, you testified that that drug deal basically fell apart, correct?
A. Yes, it did.
Q. And the aftermath of that caused you to effectively flee Canada to Zanzibar, is that right?
A. That is also correct.
Q. And I want to make sure I have the timeline here right. You were first in Zanzibar from November 2023 until late

December 2023, is that correct?
A. Yes. I had come back for holidays, and then I went back.
Q. Then you went back in January 2024, is that right?
A. That's correct.
Q. And how long did you stay in Zanzibar after you went back in January 2024?
A. I came back after that in April. I would say the second week. Around April 9.
Q. Have you been in Canada since April of 2024?
A. Yes, I have.
Q. While you were overseas in Africa, that's when you set up the Ares, Rocksteady, and Warpath Signal accounts, correct?
A. That is correct.
Q. You also had to set up phone numbers for those accounts, correct?
A. Yes.
Q. You set those phone numbers up for the accounts also when you were in Africa, right?
A. Yeah.
Q. So you weren't in Canada when you set them up, right?
A. I was in Africa.
Q. And when you set up those accounts, did you use your phone to do that?
A. I would buy burner phones. I would never do anything on my personal phone. So I would go to the store, and I would buy a

phone with a SIM card.

Q. What kind of phone?

A. IPhones, androids. I went through so many phones.

Q. Would you use a VPN masking device when you would set up accounts --

A. Yes, I would.

Q. What was the VPN masking device?

A. The VPN I was using was VPN365, something like that. I can check and I can -- if you want me to double check and let you know the exact name, I can do that too.

Q. Where would the VPN masking device have the IP addresses show up for?

A. Sometimes I would use America, sometimes I would use Canada, just to hide where I am.

Q. Where in America and Canada would you use?

A. It wasn't like -- when I do a VPN, it won't just tell me which state to use. I just click United States or I'll just click Canada.

Q. Your VPN provider wasn't T-Mobile, correct?

A. No. A VPN, you have to download an app. T-Mobile is a cell phone carrier, isn't it, in the United States?

Q. Now, let's talk about those three accounts you used. The three names were Ares, Rocksteady, and Warpath, correct?

A. Correct.

Q. And you testified that those are the three accounts that

you used to talk about setting up some of the shootings and kidnappings in connection with the fallout from the drug transaction you testified about, right?

A. That is correct.

Q. You exchanged messages over those chats with people who show up in the phone as Ghost, Jordan, and Mysterio, right?

A. I'm sorry. Can you please repeat your question?

Q. Sure. Was one of the people you messaged with or you say you messaged with in those chats named Jordan or goes by the screen name Jordan?

A. Yeah. I had text messages with him.

Q. You know who that person is, right?

A. No.

Q. No, you don't know who he is?

A. Not physically.

Q. Mysterio, do you know who Mysterio is?

A. Same thing.

Q. Ghost, do you know who ghost is?

A. The same thing.

Q. Mr. Khela, when you talked to my colleagues earlier, you testified that you knew those people but didn't want to reveal their true identities, isn't that correct?

MR. COHN: Objection. That earlier conversation was not testimony.

THE COURT: Overruled. You may answer the question.

Q. Mr. Khela, when you talked to my colleagues earlier, you told them that you knew those people but didn't want to reveal their true identities, didn't you?
A. Not exactly. These people were connected to me by other people. And I didn't -- maybe I didn't understand their question correctly.
Q. It's your messaging with these people about drug trafficking and shootings, but you don't know who they are.
A. Yeah.
Q. Who were the people who you asked --
A. I have never met them.
Q. Who were the people you asked to do the shootings?
A. I asked King to help me, who was a colleague, and he's a friend of mine.
Q. Who else was involved?
A. There is -- Jordan was involved, Mysterio was involved in helping me, yeah. I have --
THE COURT: Can you repeat that last statement again.
A. I said that I haven't met them because that's common in our world. Like people, when they do this kind of stuff, they don't like to put their face on it.
Q. Now, these three user names, the Ares, Warpath, and Rocksteady, you used those names with those folks we have talked about, right?
A. Yes.

Q. And you used different names as you switched between different phones, as you claim, correct?
A. Yes.
Q. Now, you did not tell Mr. Cheema those Signal names, correct?
A. That is correct.
Q. You didn't show Mr. Cheema the images that were the -- let me step back. Signal accounts let you put up a picture associated with the screen name, correct?
A. Yeah.
Q. You didn't tell Mr. Cheema that the picture was associated with the Ares, Warpath, or Rocksteady Signal accounts, correct?
A. That is correct.
Q. In fact, as you have testified, to your knowledge, Mr. Cheema had no idea that those Ares, Rocksteady, and Warpath accounts even existed, right?
A. That is correct.
Q. Now, there is one last thing --
A. As far as I know.
Q. One last thing I want to ask you about.
You testified that you're familiar with someone named Mike Habib, correct?
A. Yes.
Q. You know that he goes by the nickname Gato?
A. Yes.

Q. You have never sent Mr. Habib's phone number to anyone since Mr. Habib has been in prison, correct?
A. That is correct.
MR. BURNETT: Just a moment, your Honor.
THE COURT: OK.
MR. BURNETT: No further questions.
MR. COHN: Brief redirect, your Honor.
THE COURT: You may.

REDIRECT EXAMINATION
BY MR. COHN:

Q. Mr. Khela, do you remember the prosecutor asking you some questions about your time in Zanzibar?
A. Yes.
Q. And while you were in Zanzibar, did you have communications regarding this botched drug deal?
A. Yes. With my associates.
Q. And do you remember during any of those conversations referring to your own situation as feeling like you were "in a cage"?
MR. BURNETT: Objection. Scope.
THE COURT: Overruled. I'll allow it.
A. Yes.
Q. You said that?
A. Yes, I said that.
Q. Why did you refer yourself as in a cage?

A. Well, I was on an island so far away from my family, all by myself, I just felt like I was stuck. So that's what I thought when I sent the message. I'm in Zanzibar with animals running around everywhere. I felt like I was like an animal just stuck in a cage.

Q. Do you remember just at the end of his cross-examination Mr. Burnett asked you about basically whether Mr. Cheema was aware of any icons you used in Signal accounts.

Do you remember that?

A. Yes, he asked me that.

Q. By the way, are you aware that defendants in federal prisons in the United States are not supposed to be using cell phones?

MR. BURNETT: Objection. Foundation.

THE COURT: Overruled.

A. Can you please repeat the question?

Q. Sure. Are you aware that defendants who are incarcerated in the United States federal prisons are not supposed to be using cell phones?

A. Yes. I imagine no one can get a phone.

MR. COHN: No further questions.

MR. BURNETT: Briefly, your Honor.

THE COURT: You may.

RECROSS EXAMINATION

BY MR. BURNETT:

Q. Mr. Khela I just want to follow up briefly on this cage message. You wrote about that cage message in one of your affidavits, correct?
A. That's correct.
Q. And you wrote about it because you had seen that the government had quoted from that message in one of its submissions that it made before your affidavit, right?
A. Yes.
Q. Now, you were in Zanzibar --
THE COURT: Mr. Khela, this is Judge Cronan. We are back here. We had a dropoff because we were having some connectivity issues here.
Mr. Burnett is going to continue with his questioning now.
Q. Can you hear us, Mr. Khela?
A. Yes, I can hear you guys now.
Q. I want to pick back up on this cage message. You testified on redirect that you felt like you were in a cage when you were over in Zanzibar, is that right?
A. That is correct.
Q. I just want to make sure we are clear on the timeline. You were in Zanzibar from November to December and came back to Canada for the holidays, right?
A. Yes. I was here for, I would say, maybe a week or so.
Q. You went back in January?

A. Maybe two weeks.
Q. And then after the holidays you chose to go back to Zanzibar, right?
A. Yes.
Q. And then you chose to come back in April, correct?
A. That is correct.
MR. BURNETT: No further questions.
MR. COHN: One more question, your Honor.
THE COURT: One more I'll allow.

REDIRECT EXAMINATION

BY MR. COHN:

Q. Do you remember Mr. Burnett asking you about sending along a message with contact information for a man named Gato?
A. Yes.
MR. COHN: Two. I'm sorry.
Q. Do you know other Gatos besides Mike Habib?
A. Yes.
MR. COHN: No further questions.
THE COURT: Thank you, Mr. Khela. Your testimony is over now, so we will terminate the Teams call. Have a good rest of the day.
THE WITNESS: Thank you.
(Witness excused)
THE COURT: Does the defense have any further witnesses they wish to call?

MR. COHN: The defense rests, your Honor.

THE COURT: It's 12:40 now. Why don't we take a lunch break, and then we will resume with any closing arguments. I know the government has provided a copy of their Power Point. Then we will hear from the defense as well.

I do want to let everyone know that I will need to conclude today around 2:45, so we may need to resume, depending on how things go. We will find a time in the very near future so we can resume. Why don't we come back at 1:45.

(Luncheon recess)

AFTERNOON SESSION

1:45 p.m.

THE COURT: We will resume now with closing arguments, for lack of a better term.

Mr. Shahabian.

MR. SHAHABIAN: Before I begin, for the record, there is some rebuttal evidence that we added to the Power Point that was just submitted, but we did not mark the exhibits separately.

In slide 8 of the revised Power Point deck that I am about to use, I proffer an agent downloaded the VPN app that Mr. Khela referenced, VPN 356, and used the same IP lookup software to generate IP returns while using VPN 365. And the results of those lookups are the four images on slide 8.

THE COURT: Are those marked as an exhibit?

MR. SHAHABIAN: They are not separately.

For the record, I'll say these are Government Exhibits 907-27 through 31 or 27A through 27D.

THE COURT: So 907-27A through D?

MR. SHAHABIAN: Yes, your Honor.

THE COURT: Aside from the objections that have already been made regarding due process and the overall objection to the evidence, is there any objection to these three exhibits coming into evidence?

MR. MURRAY: Your Honor, I think our objection remains

the same. Again, this was the analyst who testified. The analyst who testified, I think there is no indication that they actually got these, so this is from some individual, as far as we know, who has not testified here.

THE COURT: Mr. Shahabian.

MR. SHAHABIAN: That's correct, your Honor. It wasn't Ms. King. It was a different agent. Are they challenging -- I'm proffering that this is using the VPN 365 loop and the public lookup service. If they are challenging authenticity, and we need to put on a rebuttal case, we can do that.

THE COURT: That's my question, Mr. Murray. I certainly agree it did not come from the witness who testified. I guess my question is, are you challenging this coming in based on authenticity grounds or some other grounds aside from the general objection earlier, in which case the government would have to put on a witness to admit these.

MR. MURRAY: Your Honor, we are just making a record. We are relying on the same objections lodged earlier. We are not objecting on the basis of authenticity.

THE COURT: Remind me again the exhibit numbers.

MR. SHAHABIAN: 907-27 letters A through D.

THE COURT: So 907-27A through D are received.

(Government Exhibits 907-27A through D received in evidence)

THE COURT: Just be sure to provide copies of that to

us and defense counsel.

MR. SHAHABIAN: Yes, your Honor.

THE COURT: Thank you.

MR. SHAHABIAN: Your Honor, I have a Power Point presentation, and I plan to get through as much as I can in the time we have remaining.

Before I start with the Power Point, I just want to take a step back and start with the absurdity of what the just Court just witnessed, which is a calculated effort to have a witness lie under oath while refusing to come to the United States to face the consequences of his lies in an attempt to tailor his testimony to the government's evidence to undermine what will be obvious when we go through the closing, which is this defendant used the Ares, Rocksteady, and Warpath accounts to arrange for shootings and kidnappings in the Toronto area while in the MDC. The fact that after we caught him doing that, he would go so far as to have a witness knowingly commit perjury, I'm astounded. I'm astounded at the conduct. It shows disrespect for the Court, it shows disrespect for the consequences of his actions, and it demands serious punishment.

I just want to take a step back. We are going to go through the technical aspects of how we know this defendant committed this conduct, but the fact that this is where we are, that after being faced with this evidence he would go so far as to have a person lie for him under oath speaks volumes.

Let me go into the Power Point.

If we go to the next slide.

When we are done with the closing presentation we will have shown that the defendant is ARES, Rocksteady, Warpath. He sent the messages to King to arrange for these shootings through three buckets of evidence.

First, the contraband iPhone seized in the MDC from his codefendant's cell has names, photographs and phone numbers used by the Ares, Rocksteady, and Warpath accounts as found on the King phone in Toronto.

Second, the evidence will show that the defendant used both the contraband iPhone that was seized, as well as other phones in the MDC that have not to this date been seized or not in the government's possession.

Third, the substance of the actual messages, as taken from the King phone in front, from Ares, Rocksteady, and Warpath, they only make sense as being sent from the defendant, not from Mr. Khela.

Let's start with how we know Mr. Khela lied to this Court repeatedly.

First, I submit it was obvious, given his testimony, given his refusal to answer questions about his own conduct and his clear lies about things about not knowing who Jordan, Mysterio, and Smooth are when he is arranging shootings and drug trafficking with these people. But we have more specific

lies that make it clear.

We can go to the next slide.

Here is an obvious one. Mr. Khela said repeatedly he is not married. This is a snippet from the 302 of his prior interview. We don't have that testimony from today yet, at transcript, but he repeated today that he's not married. The defendant is married to Amrit Jhooty, and Warpath, in communicating with King, references talking to his wife. This is one of the messages from June 6, 2024. Warpath says: Calls back in a minute. Just talking to wife or call bro phone. Doesn't make any sense coming from Mr. Khela, who is not married.

Next slide.

This came up in his previous interview with this office and today. Mr. Khela said he did not know who sent the message that came from the Rocksteady account as providing a phone number for Gato, which the Court knows is the nickname for codefendant Michael Habib. He didn't register any accounts for Michael Habib. He doesn't know who provided the phone number. And when he was previously interviewed by this office, he said he frankly didn't know how this message got sent from the account, since he is the only person that had access to it. This was a lie.

Go to the next slide. Here are the messages that were sent from the Rocksteady account on the left. They are back to

back. First, a number for Tana. Tana knew at this one, followed by Gato knew. They are both sent. March 27, at 2:55 a.m., that's Greenwich mean time. So if you convert back, it would be about four hours earlier, and 3:15 a.m.

Mr. Khela said he didn't know who registered this number. It wasn't him. But he did do the Tana numbers. The problem is, the same MySudo account registered both of these phone numbers. The person who registered the Tana number also registered the Gato number, did it using the same MySudo account. That's the return on the right. Those are subpoena returns for MySudo, which, as the Court heard, is the application used to register these phone numbers, which are then used to create Signal accounts associated with the phone numbers.

So what you can see on the right is the Gato number ending 7714 was created from a MySudo account on March 27, 2024, and this is a subsequent email from MySudo that's below. It's in the 3500 material where they clarified the time. The Gato number was created on March 27 at 2:49 a.m. The Tana number ending 6994 was created on March 27 at 2:52 a.m. Three minutes later the Rocksteady account sends both numbers to King.

Mr. Khela couldn't tailor his testimony to every piece of evidence in the government's exhibit list, he didn't clearly have access to all of it, or maybe understand all of it, but it

just shows that he's lying when he says, I don't know who registered the Gato account, it wasn't me, but I did register the Tana accounts. The same person registered both of these numbers.

As we will talk about, it was Mr. Cheema who did that because he is cell mates with Mr. Habib, who is Gato. There is evidence that they are both using contraband in the MDC, and this is him using one MySudo account registering both of these numbers on March 27.

Next slide.

Now what we saw today was Mr. Khela attempting to tailor his testimony to the government's evidence as he learned more about it. When he was interviewed by this office a few weeks ago, what he said is not only had he not been in touch with the defendant or with Michael Habib since early 2023, he didn't really know Bhupinder Virk, and he did not register phone numbers for them, he did not provide them with access to the Ares, Rocksteady, and Warpath Signal accounts. It was all him in Canada.

Now, after the government disclosed its exhibits, they realized, or he realized, that was a problem because it doesn't comport with the fact that evidence of these accounts appears on the device seized from the MDC. Somebody in the MDC clearly knew about these accounts since the phone numbers, search terms, and profile pictures appeared on the accounts at the

time the communications began.

If we go to the next slide.

After the government disclosed exhibits, as we will talk about, one of the key exhibits is a Gmail account and Apple ID called gottijat that was used to register many of the MySudo numbers that were used to create the Signal accounts.

Today, for the first time, Mr. Khela decided to say, actually, I was scared, and I was confused when I told them I hadn't talked to Virk. I did talk to Virk, and I created the gottijat account for him. That is a lie. There is no evidence that Bhupinder Virk ever used the gottijat account.

And in fact, going as far as back as 2023, Mr. Cheema used a variation on gottijat, jatgotti, as his Snapchat name. This is, frankly, absurd. I just want to emphasize this. That man took the stand remotely, because he refused to come here and take it, and lied to your Honor after knowing more about the government's evidence in an effort to undermine the case and obstruct justice. This is insane.

What's moreover, even this news story doesn't comport with the evidence because Mr. Khela continued to say he was the only person who used the Ares, Rocksteady, and Warpath profiles. He was the only person responsible for sending the messages. And even this attempt to explain some of the government's evidence, now that he understands it, doesn't account for the fact that, as the Court saw and as we will

review in detail, profile pictures, phone numbers, user names for the Rocksteady, Warpath, and Ares accounts appear on the MDC phone. The reason they appear on that phone is because the defendant created them. He didn't need Mr. Khela to tell about them. He made them, and he used them from the MDC.

If we go to the next slide.

The VPN. As the Court saw today, the defense was animated about the VPN, about the IP evidence in the government's closing slides, the IP evidence from the Snapchat account showing Mr. Cheema using multiple devices to access his Snapchat account in New York at the MDC.

So what Mr. Khela did was come up with a new explanation that, actually, I was using with a VPN to disguise my IP address and I set the United States as my location because when you're in Africa and you want to hide where you are, you decide to make your IP look like New York City, where your friend is. That's a very commonsensical thing to do.

As I just noted before we started, after his testimony, we used the application. He said he used VPN 365. We went to the same website that was used for all the other IP lookups in this case. And unlike those lookups, which we will see, which show ISPs like T-Mobile and Verizon, which are actual IPs serviced by actual IP providers, when you use a VPN, you get weird ISPs, like IncogNET LLC, Voltaire Holdings LLC. You don't get normal, major telecom companies when you're using

a VPN. In fact, this IP software says, hey, looks like you're using a VPN, which we were for this, and, as you will see for the other IP address information, wasn't the case. Again, this was a lie, tailored to the government's evidence as he was understanding it in real time.

None of the evidence in this case comes back to Zanzibar or Africa. As my colleague, Mr. Burnett, pointed out on cross-examination, the idea that the in-the-cage reference, which is clearly Mr. Cheema talking about being stuck in the MDC, was Mr. Khela talking about feeling like he was in a cage in Zanzibar, which he went to on vacation and then went back to for several months after the holidays is, again, absurd.

If we go to the next slide.

There are more technical reasons we know this is a lie. We can use time zones. As we mentioned, many of the returns are on UTC. New York is UTC minus four or minus five, depending on Daylight Savings Time, as is Toronto. Zanzibar is UTC plus three. So we are talking about a seven or eight-hour difference.

Many of the messages that we will go through in this Power Point presentation make sense being sent late at night from New York, after count, in the cell, using the contraband phones. They don't make sense if you're in Zanzibar.

So, for example, at 3:50 UTC, Ares says: Get some sleep. Call me with some update. The time in Zanzibar was

6:50 a.m. It's New York time 11:50. This is one example. You could say maybe he stayed up late.

But I would submit that if you look at the pattern of time stamps through the all messages sent from these accounts, it makes no sense that someone is regularly sending them at hours when most people are sleeping, and the reason it makes no sense is because they weren't sent from Zanzibar. They were sent from the MDC.

If we can go to the next slide. This is one we didn't do on cross-examination, but it's in the 3500 material, which the Court is, of course, free to consult at this *Fatico* hearing. When asked why he picked the name Ares as one of the profile names, he said zodiac Aries, that's his birth symbol, and he just dropped the I.

Again, that is absurd. As the Court knows from the metadata from the MDC contraband phone, the search returns, which we will go through, are things like Ares god of war, lord of war. That's not the Aries zodiac symbol.

If we go to the next slide.

That's it in terms of the clearest lies that Mr. Khela told. We picked a few of the just most obvious examples. The Court saw the testimony. I think it was obvious, both from his demeanor on direct examination, where he clearly had some sort of advanced knowledge of what the questions were, given the smoothness of his responses, his understanding of each

question, and the clarity of each answer, versus cross-examination, where he struggled to come up with answers, like what VPN application he used to hide IP addresses.

I would submit Mr. Khela was lying, and he was doing what he could to protect one of his closest friends, Mr. Cheema, while doing also whatever he could to make sure he didn't get anyone else in trouble, like when he lied about who not knowing who his coconspirators were, like Jordan and Mysterio.

Having dispensed with Mr. Khela's testimony, I now would like to turn to the evidence that conclusively demonstrates that Mr. Cheema is the Ares, Warpath, Rocksteady account user.

Just to start with an overview, as the Court knows from the various submissions in this case, the government's position is that after his arrest, while in the MDC, the defendant used contraband phones to send his codefendant, Dupinderdeep Cheema, who we referred to as King throughout this case, texts over Signal to arrange for several shootings, attempted kidnappings, even discussions of murder, in the Toronto area. Mr. Cheema used different physical phones, phone numbers, and Signal profiles in connection with these messages. But the government can show that he's responsible for the texts and these shootings based on several pieces of evidence.

If we go to the next slide.

First, we are going to look at the substantive texts as recovered from the King phone, which was seized by Canadian authorities incident to King's arrest in March of 2024. We can compare that to the metadata and other data that was taken from the contraband phone in the MDC, which shows the defendant's online activities at various times he sent the substantive messages to King.

That phone was seized from his codefendant's cell, Bhupinder Virk, on July 19, 2024. As we will establish, that cell was next to Mr. Cheema's, and the messages make clear that they are in communication, including the use of contraband phones.

There is also evidence from third-party service providers establishing the contraband phone's use of various electronic accounts. Those are the MySudo accounts, Apple accounts, Gmail accounts, Snapchat accounts. These returns show that it was not only the seized phone, but multiple contraband phones that Mr. Cheema had access to in the MDC. And we will show his use of the contraband iPhone, in part, through some of the searches we looked at.

To give you a preview, there was the Yakuza Japanese boss that Mr. Cheema, on recorded jail calls, discussed some of the same topics he was searching on the contraband iPhone.

If we can go to the next slide.

Just to give the Court background on what we are

talking about here, I don't understand the defense to be disputing what happened in Canada, and I know the Court has our submissions.

But just to give a timeline, on February 15 of this year, there was a shooting at AMG Global outside of Toronto. AMG Global is the trucking company that was used to transport the cocaine that was seized at the Ontario border.

About a week later, on February 23, victim-2, who is the spouse of the owner of AMG Global, was approached outside her home by a man who said they are owed money, threatened to shoot victim-2 and her family, and displayed a gun.

Two days later, a man tried to kick in the front door of victim-1 and victim-2 outside Toronto and then fired multiple gunshots into the front door, the side of the house, and the garage.

If we go to the next slide.

On February 29, there was another shooting outside a different residence in the Toronto area. That is surveillance video and video that was sent to King from one of the coconspirators, which shows that the person who committed this shooting appears to be the same person from the shooting four days earlier.

That evening, victim-2 received a call, again, threatening her, saying she and her husband owe them $2 million and that if they don't pay they will shoot her and her family.

On March 17, two suspects fired 11 gunshots at victim-1 and victim-2's house.

March 22, King himself called victim-2 and demanded that she pay $2 million or have victim-1 return the seized narcotics, or they will continue shooting at her house.

Five days later, on March 27, King was arrested, and the phone that we are going to be discussing was seized.

This came up in some of the defense submissions. Victim-1 and victim-2, they are victims of these shootings and extortion efforts. To be clear, this is a drug debt. These are people in the drug world who are engaging in reprisals over lost narcotics loads, demanding money, demanding narcotics be returned, or they will engage in violence, just so there is no dispute with the government that that's what this is about here.

If we go to the next slide.

So this presentation is going to proceed in four parts.

First, it starts with a chronology that lines up the evidence from the cell phones with the sequence of events of the shootings. It's a detailed chronology. I have takeaways at various parts of the chronology to help the Court follow along. We have provided it to the Court.

The government submits that looking at the chronology as a whole makes clear why Ares, Rocksteady, and Warpath are

the same person and how it is clear that it is the defendant, Mr. Cheema.

After we walk through their chronology, we will discuss other evidence showing that Mr. Cheema used contraband phones in the MDC. That is separate from the chronology, other evidence showing he used the contraband iPhone, the seized phone, separate from the chronology and other evidence that he is the person who sent the shooting messages to King.

If we go to the next slide.

Starting with the chronology, I mentioned some of this. The chronology shows that the contraband iPhone was one of multiple phones. It's not the only phone that was used to create these accounts. We are not contending that all of the relevant evidence about the account usage comes from that seized iPhone. There are other phones out there that were floating around the MDC that we don't have, but we know that multiple phones are being used, and the chronology will show that.

The chronology also shows that Ares, Rocksteady, and Warpath, three different Signal profiles, are the same person, and they are used by the same person, that is, Mr. Cheema. The chronology also shows that Mr. Cheema used both the seized contraband iPhone and other devices.

Starting with the chronology, we are going to start in September 2023. The Axiom report that Ms. King testified about

shows that, in September, from the contraband iPhone, there are already four usage entries for MySudo. So MySudo is the phone-number generator. It can generate random phone numbers that you can use to create Signal profiles or other profiles, and the MDC phone is using that application as early as September 2023.

If we go to the next slide.

That same day, September 5, 2023, Snapchat records show that Mr. Cheema's Snapchat account, sunny.cheema, which is linked to his email address, surindercheema93@gmail.com, was accessed the same day that MDC phone accessed the MySudo application. And as we saw earlier, Snapchat snows you the IP address that was used to access it. It also shows you the phone model. In this case it mentions iPhone 13,1 and iPhone 11,8.

I don't think the defense is disputing that sunny.cheema is the defendant's Snapchat account. We didn't mark all of these exhibits, but I would proffer to the Court that, for example, that Gmail address is one that the defendant provided to CBP during a border stop during his arrest. There is other evidence linking him to the usage of the Snapchat account. If they are disputing it, we can submit more evidence demonstrating his control over this account, but we can start with the fact that it got its name.

If we go to the next slide.

So the IP addresses, as Ms. King testified, all geolocate to New York, New York. Again, you can see here the ISP is T-Mobile. It's not a VPN lookup. It's a standard cell phone company, consistent with using a cell phone in the MDC to access their Snapchat account.

If we go to the next slide.

This just digs into the Snapchat metadata a little more. So it shows that iPhone 11,8.

If you look at Government Exhibit 400, iPhones report in two ways. A iPhone 11,8 is actually an iPhone XR, so the model name and the number name are different, but that's what an 11,8 is. An iPhone XR, that the same model as the seized phone from Mr. Virk's cell.

Same day that an iPhone XR from Mr. Virk's cell is accessing MySudo, the defendant is using an iPhone XR that geolocates to New York his access his Snapchat account.

The other iPhone, iPhone 13,1, that's an iPhone 12 mini, again with IP addresses that geolocate to the New York area, likely another contraband phone that the defendant is using to access his Snapchat account.

If we go to the next slide.

These are subpoena returns from MySudo. These show that that same day, September 5, 2023, an Apple phone was used to create a MySudo account. That was at 20:20 UTC time.

If we go to the next slide.

The metadata from the seized phone from the MDC shows 11 artifacts relating to MySudo.

If we go to the next slide.

These are the artifacts, which Ms. King talked about during her testimony.

And if we go to the next slide.

These are the takeaways from this evidence. Contraband iPhone taken from Virk's cell was used to create a MySudo account in September 2023. Cheema used the contraband iPhone, an iPhone XR, that same day, to access his Snapchat account, and he already had access to multiple phones, as shown by the Snapchat returns.

And I want to stop here for a minute before the timeline jumps to January because, if you'll recall, Mr. Khela was very clear that many of these events that he got involved in started occurring in November of 2023. That's when he started making all these user names and registering all these numbers. We have as early as September the defendant using contraband phones to access applications like MySudo. This is not something that came out of Mr. Khela's head when he got in trouble. This was a regular means of communication from the MDC using anonymous numbers generated by MySudo.

We can go to the next slide.

Jumping ahead to January 2024.

And before I keep going, we are going to go through a

lot of different MySudo accounts and MySudo records. I am going to tie them together as go move along. But these MySudo accounts are all related to the Ares, Rocksteady, Warpath accounts that were used to send the shooting-related messages. These aren't just random MySudo accounts that we picked out. I just want to make that clear since we are in a pretty detailed chronology here.

So January 2024, MySudo records showed that this time an Android device was used to create a MySudo account and that the two phone numbers were generated using this account in February. First, the account is created. You download the app. You pay for a subscription, in this case using an Android device. And then you later use that application to generate phone numbers that can be used for other purposes. Here you have the account being registered with an Android on January 7, 2024.

You can go to the next slide.

We have evidence that the defendant is using an Android device during this time frame. So this is three days later, the Snapchat records show that Mr. Cheema accessed his Snapchat account, sunny.cheema, using an Android 12 device with an IP address ending in 163.

If we go to the next slide.

That IP address returns to New York City. Again, the ISP is Verizon, not some sort of VPN software.

If we go to the next slide.

Jumping ahead to January 28, again, access to his Snapchat using an Android 12, IP address ending in 67.

Next slide.

Also returns to New York, also Verizon ISP.

If we go to the next slide.

Jumping ahead to February, we now see this is the one of the accounts -- one of the phone numbers that was created with that Android-generated MySudo account from January. So on February 7, a phone number ending 5002 was created at 6:46 UT7 using the Android that had previously registered that account.

If we go to the next slide.

The next day King received a Signal message from Jordan providing that phone number ending in 5002, and he called it Tana new number. I'm sure the Court is aware of this at this point, but the defendant's nickname is Tana. It's the name he used during the charged conspiracy. It's in the caption of this case. His claim now it was actually Mr. Khela who had stolen his Tana nickname. To be clear, here is already Tana, Mr. Cheema's number being provided to King.

I think there is one more important takeaway here, if we go to the next slide.

We don't have all the relevant messages. This is Jordan providing Cheema's number to King, so the clear implication is that the defendant was in contact with people

other than King who were involved in the shootings.

We don't have all of the evidence, we don't have all of the messages, and I want to acknowledge the gaps in what we don't have. But what this shows is other people involved in these shootings having access to these phone numbers and providing them to King.

If we go to the next slide.

Two days later, Cheema's Snapchat account, again accessed using an Android 12. Again, they geolocate to New York.

If we go to the next slide.

Those are the IPs showing an Android 12, Verizon ISP, geolocated to New York.

The consistency that every VPN would return to New York is, I would submit, absurd. Almost every. We will talk about one that returned to Dallas.

If we go to the next slide.

This is February 12, two days later. This time it's a different device. It's an Android 11, again showing access to multiple devices in the MDC. He accesses his Snapchat account.

If we go to the next slide.

That one also locates to New York City, to a Verizon ISP.

Next slide.

So the broader takeaway from this February sequence is

the defendant had access to contraband Android devices at the same time an Android device used MySudo to register the Tana new number that Jordan provided to Cheema.

If we go to the next slide.

About five days later, February 15, that's the first shooting at AMG Global, eight shots fired.

The next day, February 16, MySudo records show that two phone numbers were generated ending 3521 and 8123, using an Android that had the same subscription as the previous MySudo account.

If we go to the next slide.

You can see in the subpoena returns, there is the transaction identifier that's on the bottom. For this account my MySudo prescription ends 55.0. Those are unique subscription identifiers. Some of them repeat. That was one that repeated.

If we go to the next slide.

It says: The next day, February 17, King and Jordan trade messages about the February 15 shooting at AMG. This is discussed in our sentencing submission. Jordan says: Bro, nothing happens. I sent guys to look. No shooting. Everything looks normal.

If we go to the next slide.

Four days later, King gets a voice note from Jordan. We have the audio embedded. This is the combination Punjabi

translation and English, where there is a reference to Jordan telling King to talk to Tana, make Tana understand what the plan is, that they are going to do it tomorrow when they get the chance. For time I'll skip the audio. Of course, the Court is welcome to listen to it.

Go to the next slide.

The next day, tomorrow, victim-1 -- that should be victim-2. That's a typo -- is approached and threatened at gunpoint. Then, later that day, Jordan sends King a message: Bro, it's done. He got the job done.

Clearly, they are arranging the threat to victim-2, or she is threatened at gunpoint, and Jordan is telling King, make sure Tana understands what we are about to do.

Go to the next slide.

February 23, at 2:49 UTC, an Apple iPhone creates the Google account gottijat@gmail.com.

If we go to the next slide.

Ten minutes later, at 3 UTC, the contraband iPhone, this is from the data on the iPhone, used the email address gottijat@gmail.com to create an Apple account. That's both from the contraband phone and from Apple subpoena returns.

I want to stop here for a second because, frankly, I missed this when I was cataloging Mr. Khela's lies.

He claimed that he created the gottijat account for Mr. Virk and, I guess, provided it to him somehow. That makes

no sense. It was created on the phone in the MDC. The contraband phone has metadata showing that he is creating this account at that time. So there is no evidence to support Mr. Khela's new, ridiculous assertion that he somehow created the account in Zanzibar and provided it to Mr. Virk.

If we go to the next slide.

That Apple account from the subpoena returns was registered using two addresses. One was the MDC. The other was this address 9 Falling Rock in Ontario.

If we go to the next slide.

9 Falling Rock, both Cheema and Virk used these addresses in their BOP records. The BOP has explained, and we disclosed this in the 3500, that the inmate puts in the contact information for various contacts in their BOP logs. The top one is Mr. Cheema's BOP contact log, and he used 9 Falling Rock for Mr. Khela and variations on Falling Rock for his attorneys, Ms. Florio, and Mr. Declan. And Mr. Virk also used 9 Falling Rock, including for Deep Cheema, who is Mr. Cheema's brother, is my understanding.

If we go to the next page.

Talked about this a bit. Gottijat was not a new name for Mr. Cheema. From the Snapchat records we know that, as early as February of 2023, he was using the profile name jatgotti, gottijat reversed, as his Snapchat name with a Gmail address jat.gotti@gmail that was also registered using the 9

Falling Rock address. This is a consistent practice of Mr. Cheema's.

If we go to the next slide.

Again, the takeaway, the gottijat account is Mr. Cheema's. It's consistent with profile names he has used for Snapchat, things that predate Mr. Khela, again, who says none of this started happening until November of last year and are totally inconsistent with Mr. Virk somehow getting the gottijat account from Mr. Khela.

If we go to the next slide.

We are going back to the timeline. This is still February 23, 2024. This is literally 10 minutes after the gottijat account was created in Google and in Apple. It then accesses the iTunes Store. This is from the contraband phone.

If we go to the next slide.

What we have from Apple is at that time, five minutes later, the gottijat Apple account made a purchase in the Apple store for an application that got a specific ID, that 1700 number ending 121 that used an IP address that returns, again, to T-Mobile in New York and it's an Apple iPhone, so, again, all consistent with the contraband phone. These are the Apple subpoena returns.

If we go to the next slide.

MySudo also has records for this Apple transaction ID that is associated with the gottijat account that is making a

purchase in the iTunes Store that night. It shows that there was a subscription to MySudo associated with that unique Apple transaction ID.

The takeaway is, Mr. Cheema created the gottijat Gmail account; five minutes later, creates the Apple account using that Gmail; five minutes later, goes into the Apple store, pays for a MySudo subscription on the contraband iPhone.

We will come back to these MySudo subscriptions.

If we go to the next page.

Again, this is what I said. The takeaway is, Mr. Cheema purchased a MySudo subscription on the seized contraband phone which she later used to register two phone numbers connected to the shootings in March.

We will get to those phone numbers at the appropriate time in the chronology.

Let's go to the next slide.

Five minutes after the gottijat account purchased the MySudo subscription on the contraband phone, we also know from MySudo that a different MySudo account was created using an Android device, and that device registers a phone number ending in 3032 two minutes later. Two phones, five minutes apart, both creating MySudo accounts. One is the contraband iPhone, the other is an Android that we don't have. The Android two minutes later creates this 3032 number.

We go to the next slide.

This is the same account that is also used to register other numbers later, and we can see that if you go back a slide.

So the 70..1 is the Google identifier with this MySudo account.

If we go to the next slide.

The 70..1 is also the transaction identifier for this account; again, multiple accounts all tied back to the same devices and subscriptions.

If we go to the next slide.

Now we are still on the night of February 23, 40 minutes after this Android MySudo account and number is created, the 3032 number. From the contraband iPhone, the seized iPhone, the deleted web history shows seven Google searches for Ares god of war. That's from the seized iPhone.

If we go to the next page.

This is part of that seized iPhone Cellebrite report showing Ares god of war. It shows the date. The yes in the right hand column shows that it was deleted from the history but recovered by Cellebrite.

If we go to the next slide.

A few minutes later, after these Google searches, there is a contact created in the contraband iPhone for Ares with the dollar sign symbol with the phone number 3032 that was registered, created with the MySudo account from the Android.

So 45 minutes after that account is created on an Android, it's already being saved in the contraband iPhone using the user name Ares.

Go to the next slide.

King -- this is the next day. King phone shows King telling Mysterio and Smooth: Tell him to do it tonight. Smooth responds: Slid. Going to get it done tonight.

If we go to the next slide.

Still the same day. Mysterio sends King Signal texts. These are the screenshots of a Signal contact page for Ares, again, ending in the 3032 number that was registered on the Android the day before, and the text message she sends is Tana new number; again, a new number for the defendant that he had just generated in the MDC the day before and sent to Mysterio, who is now providing it to King.

If we go to the next slide.

We looked at these messages. This is the Signal profile that Mysterio sends to King. It shows on the right the user name Ares with a dollar sign, the phone number ending 3032, and a profile picture, Ares the god of war showing what looks like a Roman centurion character.

Go to the next page.

If you Google Ares god of war, which is Government Exhibit 901, it's literally a video screenshot of what do you get if you Google Ares of war. You will find the photograph

that is the profile picture for the Ares user name. That's where it comes from.

Go to the next slide.

What is obvious from this? Mr. Cheema used both the contraband iPhone and an Android phone to create the Ares profile that was used to send the shooting messages. The contraband phone was used to find the profile picture, that Roman centurion cartoon character. The Android phone was used to generate the MySudo number that was first associated with this Ares profile, and then the contraband phone saved as a contact an Ares phone number all before Mysterio provided the profile picture and contact information to King. This is not Mr. Khela. This is not Mr. Virk pretending to be Tana or getting information from Mr. Khela. This is Mr. Cheema.

If we go to the next slide.

The next day, February 25, the contraband phone and the Apple subpoena returns show that the gottijat Apple account was logged in on the contraband phone.

If we go to the next slide.

Approximately 30 minutes later, the King phone shows Signal messages from the Rocksteady account. And I want to talk about this event because it's sort of an artifact of the Cellebrite that's going to show how Ares becomes Rocksteady. It's not actually Rocksteady yet, but it appears that way in some of the Cellebrite reports.

If we go to the next slide.

Sorry, next slide.

So this is the beginning of the Cellebrite report showing the Signal chain between Ares, Rocksteady, and King. King is John hashtag LG. He is the owner. What it shows is hi on February 25, 2024.

If we go to the next slide.

Three seconds after that message, we know from the King phone that he creates a contact for Ares with the dollar sign and with that phone number ending 3032.

We also know that Ares and Rocksteady are associated with the same contacts.

If we go to the next slide.

This is the contact information from the King phone. We looked at this with Ms. King.

I know we shouldn't have picked a witness with the same name, but here we are.

And you can see in row 2, profile name Rocksteady, old user name Ares. As we will explain further -- I am just trying to table-set here -- Ares becomes Rocksteady. And because it was Rocksteady when the phone was seized, it shows up as Rocksteady in certain messages, but it's still Ares at this point.

If we go to the next slide.

We know that from other evidence. For example, the

4600 number that ends with all the Rocksteady messages in Cellebrite, that actually wasn't created until March. We know that from the MySudo returns, and we will get to that, and we will talk about when in March Ares changes to Rocksteady.

If we go to the next slide.

This is just jumping ahead to explain that. If you look at the bottom text, March 26, 2024, Rocksteady changed their profile name from Ares to Rocksteady.

If we go to the next slide.

This is a technical takeaway, but it's a little confusing, so I want to make sure it's clear. Government Exhibit 206, which are the messages between Ares and Rocksteady and King, show the last name and number associated with the Signal account at the time of the seizure, which was Rocksteady and the 4600 account, but it begins with the conversation between King and Ares using the 3032 number.

Again, we said this in the beginning, multiple names, multiple numbers. It's the same person. Ares and Rocksteady are the same person. They are Cheema.

If we go to the next slide.

Now we are going to link it to Warpath. Government Exhibit 206, this is the Rocksteady, Ares chain. Shows missed video calls. Ares is trying to call King, on February 25, at 4:31, 5:03, 5:15, 5:15. Then there is a Signal message from Ares. Calling you off a different phone; again, evidence that

the defendant was using multiple phones in the MDC. Two minutes after that, there is a Signal message from Warpath and then two video calls from Warpath. There will be more evidence connecting all of these accounts, but this is the beginning of showing that Ares, Rocksteady, Warpath, all the same person.

If we go to the next slide.

From the contacts in the King phones, you saw there are profile pictures saved with some of these Signal contacts. The one associated with Warpath, Government Exhibits 213 and 213A, is this picture. That's taken from the King phone.

If we go to the next slide.

The seized MDC phone, the iPhone, has Google searches for Warpath, Marvel, and Warpath. And if you do a Google image search for the photo from the King phone -- go to the next slide -- It's the Marvel character Warpath.

So, again, this is evidence of the MDC phone. Just like it was used to find the Ares profile picture, it's being used to look up potential profile pictures for the Warpath character, which is another Marvel character.

If we go to the next slide.

Summarizing the takeaways, Cheema used the contraband iPhone to look for the Warpath, avatar photos, as he did for Ares and Rocksteady, which we have not even gotten to yet. Ares, Warpath, and Rockstead are all the same person. Calling you off a different phone shows him using multiple phones to

contact King.

Next slide.

Again, a minor technical point. The way Cellebrite renders PDFs, it has trouble with these weird characters. So Rocksteady on the left, that's how it appears in Cellebrite. Then when you PDF the Cellebrite report, you get the RK dollar sign 3AD currency number. It's the same profile. It just renders weird because of the characters.

These are just exhibits demonstrating that it's all the same people. It's just the strange characters used don't show up well in PDFs.

If we go to the next slide.

Going back to the timeline, this is February 25. These are the missed Signal calls from two phones from Ares and Warpath ending at 5:17 UTC.

If we go to the next slide.

Less than two hours later is when the shooting happened at victim-1 and victim-2's house where shots were fired at their front door and the door was attempted to be kicked in.

If we go to the next slide.

Later that day, February 25, Snapchat records show Cheema's Snapchat account using an Android 13. This is a different model Android, a new device that he's using, with an IP address that again geolocates to New York City, to a Verizon

legitimate service provider.

If we go to the next slide.

Still February 25. Later that day, the deleted web history from the contraband phone shows five Google searches for Japanese Yakuza boss.

If we go to the next slide.

Those are the searches we looked at.

If we go to the next slide.

This is from May. This is a recorded jail call where the defendant is calling -- these are actually using Mr. Virk's pack number, we will talk about this later, to make a call. He says: If you Google Yakuza boss in New York City, you are going to see a guy with rocket launchers. That guy is in my unit. I'm looking at him right now.

If we go to the next slide.

(Audio played)

MR. SHAHABIAN: I will just stop there and note for the record, it's clear it is Mr. Cheema. He is speaking with a Canadian accent, even though it's on Mr. Virk's pack number. As the Court is aware, Mr. Virk does not have a Canadian accent. He has no ties to Canada. We are going to come back to this later.

If you Google search for Japanese Yakuza boss, you get a Southern District defendant, Takeshi Ebisawa, who was held in the MDC, and a picture of him holding a rocket launcher.

Next slide.

The takeaway from this is Cheema is using the seized contraband iPhone and an Android the day after the Ares and Warpaths accounts are talking to King hours before one of the shootings; again, just showing his access to these devices consistent with the chronology.

If we go to the next slide, jumping ahead a few days, February 29, King phone creates a new contact for Warpath with a new number ending 3521. This is a MySudo number that had been generated a couple of weeks prior using one of the accounts we looked at.

Later that day shots are fired at another Brampton residence. Later that night Mysterio sends video of that shooting to King from the shooter himself. He is holding the gun or holding the camera and the gun and shooting. And then later that evening a person calls victim-2 to threaten her again.

Then, from February 29 through March 4 -- this is in the government's sentencing submission. I am not going to repeat it at length, but these are the text messages back and forth where they are talking about threatening victim-2, how are they going to get their money. At the same time, there are video calls between the Warpath and Ares accounts in King from March 1 through March 6. Again, just table setting.

If we go to the next slide.

Jumping ahead to March 6. This is from the King phone. It shows multiple phones and accounts. So at 3:03, it's a missed video call from Warpath. Ares says hi. 3:04, a missed video call from Warpath. Hey, call me, bro. Unanswered calls with Warpath, Ares, and finally a video call from Warpath, duration seven minutes, again just showing the interchangeable nature of the Warpath and Ares accounts.

If we go to the next slide.

Still, on March 6, video calls from Warpath. Then, at 3:49, unanswered video call to Warpath. So King calls Warpath. He doesn't pick up. Warpath says: Call back in a minute. Just talking to wife or call bro phone.

So this message is important for two reasons.

One, we already talked about. Khela is not married. Mr. Cheema has a wife who he's in contact with using the contraband phones, as we will discuss.

Bro phone is a reference to the phone that Mr. Habib has. There is a reference to G phone later that we will get to. And obviously we talked about the Gato new phone number.

There is then an unanswered video call to Warpath. Warpath calling you now, bro. Missed video call from Warpath. And then Ares: OK, bro, please, make some noise. AMG house, burn it and baba. Remember, baba is the nickname for Harjot Bains, who is also one of the extortion victims.

One thing I want to note here, this is an incomplete

conversation. We have the call logs, which show the back-and-forth missed calls, we have the device notifications, which are the pop-ups, messages from Ares, messages from Warpath. We don't have the messages back from King to Ares, Warpath. So it is an incomplete conversation.

But what's clear is that the defendant is talking to King, extorting him, to continue to threaten the victims in Toronto.

If we go --

THE COURT: I think we may need to stop here. We are at 2:45.

MR. SHAHABIAN: Yes, your Honor.

THE COURT: It looks like we are about halfway through.

MR. SHAHABIAN: That's correct, your Honor.

THE COURT: I was hoping to resume next Tuesday afternoon, but given the proximity to Thanksgiving, I know that may not be ideal.

Are parties able to do Tuesday, the 26th at 2 p.m.?

MR. COHN: Judge, I am able to do that. If there is even a day later this week that we can wrap this up, on Friday, would be a good day for me. Obviously, the sooner the better.

MR. SHAHABIAN: Tuesday, the 26th is fine by the government.

THE COURT: If we were to do Friday afternoon, how is

that?

MR. SHAHABIAN: I'm not available Friday afternoon, your Honor.

THE COURT: Friday I would have to move some stuff on my end too.

Let's do Tuesday at 2 p.m.

We will resume then.

Do you have a sense of how much longer?

MR. MURRAY: Your Honor, apologies. The difficulty we have with the 26th at 2 p.m. is attorney Florio and I are on trial in Brooklyn on that date.

The next date that we are wholly off there, your Honor, is December 9, as that trial has to get in before the holidays. It's an old in defendant, 2021 case.

THE COURT: So the trial is going to go from next week through the week of December 2?

MS. FLORIO: We are starting tomorrow.

MR. MURRAY: We are beginning tomorrow. We are off on the 9th. We anticipate it's going to run potentially up towards the holidays, but that we are off on the 9th.

Your Honor, this may be difficult, but I believe on the 27th, which, obviously, that is the day before Thanksgiving, that we are off for that trial or, at the very least, at most a half day, but should be off. I know I can do the 27th, as well as attorney Florio, though, obviously, the

day before Thanksgiving could be difficult for some parties.

THE COURT: That would be tough because I probably only have about an hour in the morning to do them, and I think you probably have more than that.

December 9 I could move stuff around on my calendar to open up the time, but I don't know -- that certainly seems longer than Mr. Cohn was hoping for until we resume.

MS. FLORIO: Your Honor, we have spoken to our client. Since Mr. Murray and I are both engaged in a murder trial starting tomorrow, our client has authorized Mr. Cohn to continue, but we would ask like for the 9th so we could do our closing arguments. We can continue with the *Fatico* hearing whenever the Court is available. We would just be asking for the 9th for sentence.

MR. COHN: I think what Mr. Cheema wants, if I'm not speaking out of turn, is for us to continue the proceeding and hopefully conclude the proceeding on the 26th; unfortunately, without Ms. Florio and Mr. Murray, if that's possible.

THE COURT: And then do the sentencing on the 9th.

MS. FLORIO: Correct.

THE DEFENDANT: If you can, your Honor, that's what I would like.

THE COURT: Why don't we do this. Why don't we continue the sentencing then on the 26th at 2 p.m. We will wrap that up. And then, on December 9, at 2 p.m., we will do

sentencing.

Does that work for everyone?

MS. FLORIO: Yes. Thank you.

THE COURT: Mr. Shahabian, for the government, does that work?

MR. SHAHABIAN: Yes, your Honor.

THE COURT: Mr. Cohn.

MR. COHN: Yes, your Honor.

THE COURT: Do you have a sense how long your closing remarks will be?

MR. COHN: Great question. I don't.

THE COURT: I'll let you go as long as you need to.

MR. COHN: Obviously, I need to see the rest of what's going on. Based on what I've seen so far, a half hour. If we project that forward, if we are half done, I would say an hour.

THE COURT: Wonderful. We should be able to finish up then with the hearing portion on Tuesday, and then we can plan on the sentencing on the 9th.

Thank you, everyone, and I'll see you all again next week.

We are adjourned.

(Adjourned)

INDEX OF EXAMINATION

Examination of: Page

LAUREN KING

Direct By Ms. Chong . . . . . . . . . . . . . . . .14
Cross By Mr. Cohn . . . . . . . . . . . . . . . . .33
Cross By Mr. Murray . . . . . . . . . . . . . . . .36

VICKRAMJIT KHELA

Direct By Mr. Cohn . . . . . . . . . . . . . . . . .45
Cross By Mr. Burnett . . . . . . . . . . . . . . . .56
Redirect By Mr. Cohn . . . . . . . . . . . . . . . .68
Recross By Mr. Burnett . . . . . . . . . . . . . . .69
Redirect By Mr. Cohn . . . . . . . . . . . . . . . .71

GOVERNMENT EXHIBITS

Exhibit No. Received

101 through 108; 200 through 220, including any subparts; 301 to 306-2, including any subparts; 400 through 408; 501 through 503-9, including any subparts; 601 through 605; 701 through 708, including any subparts; 801 through 812; 901 through 907-26, including any subparts, but not 907-14; and T-201-A . . . . . . . .13
907-27A through D . . . . . . . . . . . . . . . .74